## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### Hammond Division

Dr. Jon M. Doe, a.k.a. Dr. Jane F. Doe

        Plaintiff,

v.

Civil Action No. _____

THE TRUSTEES OF PURDUE UNIVERSITY, A/D/A
PURDUE UNIVERSITY CALUMET

MITCH DANIELS
Current President of Purdue University. In his capacity as Former Governor of Indiana and in
his individual capacity

MAMON POWERS
Member of Board of Trustees of Purdue University, typically represents Purdue Calumet at
Graduation, in his capacity as member of Board of Trustees and in his individual capacity.

HOWARD COHEN
Former Chancellor of Purdue University Calumet in his professional and individual capacity

RALPH ROGERS
Vice Chancellor of Academic Affairs at Purdue University Calumet and in his individual
capacity

DANIEL SUSON
Former Dean and Professor of the College of Engineering, Math and Science at Purdue
University Calumet

LIBERTY PELTER
Faculty at Purdue University Calumet, in individual and professional capacity

MICHAEL PELTER
Faculty at Purdue University Calumet, in individual and professional capacity

HAROLD PINNICK
Professor at Purdue University Calumet, in individual and professional capacity

ANTHONY MARTIN
In his capacity of Chief of Police, Purdue University Calumet

KRAIG KMIOTEK
In his capacity as Student Purdue University Calumet and in his individual capacity

DANIEL POP

Page **1** of **70**

In his capacity as Student Purdue University Calumet and in his individual capacity

NATHAN DODGE
In his capacity as Student Purdue University Calumet and in his individual capacity

ANDREW WASOWITZ
In his capacity as Student Purdue University Calumet and in his individual capacity

Defendants.

## Table of Contents

| | | | |
|---|---|---|---|
| Plaintiff and Defendants | p. 1-2 | | |
| Table of Contents | p. 3 | Count IV. Discrimination Gender | p. 58 |
| Complaint Filing | p. 4 | Count V. Discrimination-Stereotypes | p. 60 |
| Preliminary Statement | p. 5 | Count VII. Retaliation | p. 61 |
| Jurisdiction and Venue | p. 6 | Count VIII. Whistleblower | p. 63 |
| Parties | p. 9 | Count IX. Misuse of Funds | p. 63 |
| Related Court Cases | p. 13 | Count X. Unlawful Employment Practices | p. 65 |
| Prior History | p. 16 | Count XI. Robbery and Burglery | p. 66 |
| Statement of Facts | p. 21 | Count XIIa. Violation of Confidentiality | p. 66 |
| Complaints and Grievances | p. 23 | Count XIIa. Libel | p. 67 |
| Isolation | p. 27 | Count XIII. Conspiracy | p. 68 |
| Removal from Positions | p. 34 | Count IXX Discrimination Race | p. 69 |
| Student Evaluations | p. 34 | Relief Sought | p. 69 |
| P&T Inconsistencies | p. 37 | Jury Demand | p. 70 |
| Hate | p. 38 | | |
| Financial Improprieties | p. 39 | | |
| More Hate | p. 41 | | |
| Research | p. 48 | | |
| Causes of Action | p. 48 | | |
| Count I. Freedom of Speech | p. 48 | | |
| Count II. Equal Protection | p. 52 | | |
| Count III. Due Process | p. 55 | | |

## COMPLAINT FILING

## PRELIMINARY STATEMENT

1.    Here Ye, Here Ye, Plaintiff, John M. Doe ("JMD") a.k.a. Jane F. Doe ("JFD") brings a

series of serious allegations to the court for adjudication against said Defendants.  Plaintiff has

spent a life time working at the highest level of competence and was at the top of his field to

meet the strategic needs of the United States in the area of Pharmaceuticals and Bioenergy.

Plaintiff will show how over a 6 year period, Purdue University used egregious, mean-spirited,

intentional and malicious means to unlawfully remove Doe from his position via denial of

tenure.  Doe has not recovered from this job loss and is not able to contribute to the highest

levels of intellect needed in this country in Analytical Chemistry as well as Chemical

Engineering had he been given tenure at Purdue University Calumet.

2.    This is an action for violations of the 1) first amendment for constitutionally protected

speech, 2) fourteenth amendment for equal protection of the laws, 3) Whistleblower Law (1863

United States False Claims Act revised in 1986), 4) Violation of Confidentiality (5 USC § 552a)

or Libel (32 CFR 516.27), 5) discrimination based on not meeting sex stereotypes and gender

(sex),  (20USC § 1681)[1], 6) 42 USC § 5891 – Race and National  Origin discrimination

prohibited)[2], 7) Retaliation  (20 USC § 1681), 8) Misuse of Funds– 42 USC § 12753, 9)

Robbery and Burglary (Breaking and Entering) 18 USC 103, 10) Conspiracy to Interfere with

---

[1] http://www.law.cornell.edu/uscode/text/20/1681 downloaded 31JAN13 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…

[2] http://www.law.cornell.edu/uscode/text/42/5891 downloaded 31JAN13 No person shall on the ground of sex be excluded from participation in, be denied a license under, be denied the benefits of, or be subjected to discrimination under any program or activity carried on or receiving Federal assistance under any subchapter of this chapter.

Page **4** of **70**

Civil Rights (42 U.S.C. 21, 1985) 11) Unlawful Employment Practices[3] 42 USC § 2000e–2, 12)
Obstruction of Justice (18 USC 73), 13) Due Process (42 U.S.C.S. § 1983)[4]

3.    Plaintiff seeks injunctive relief, back pay and front pay, medical expenses, house sales
losses, medical coverage, compensatory damages, lost opportunity costs, punitive, pre-judgment
and post-judgment costs.   Since this is a denial of tenure case, pay until death (estimated age 85)
at the value of associate professor based for Chemistry.   Four years of back pay for working
double time in performing the job and having to protect the job.   Compensatory damages include
going back to school, medical expenses, approval of about 27DEC10 pre-authorization and
medical coverage, and medical coverage for life.

4.    These actions are being filed as a civil action.   Some of the actions could be filed under
criminal action; however, due to in action on behalf of city police, university police and the
Indiana Attorney General's office, all actions are filed under civil action at this time.   The
Federal Rules of Civil procedure has a gate to define the final list of defendants prior to trial.
This gives opportunity based on discovery to move possible defendants from a civil charge to a
criminal charge.

5.    Based on case history state officials have the capacity for liability claims.

---

[3] It shall be an unlawful employment practice for an employer— (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

[4] Under 42 U.S.C.S. § 1983, state-created danger is recognized as a basis for substantive due process claims. State actors are liable under § 1983 only for their own actions except where a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence. To state a prima facie case, the plaintiff must show that (1) state actors created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) the plaintiff was a member of a limited and specifically definable group, (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the conduct, when viewed in total, shocks the conscience.

*Benning v. Board of Regents of Regency Universties*, 928 F.2d 774, 778-779 (7th Cir. 1991) allows the defendants that are state officials to have the capacity for individual liability for the claims. The Seventh Circuit has rejected the qualified immunity defense in several cases where government employees allege a violation of the first Amendment. See e.g., *Gustafson v. Jones*, supra, 290 F.3d at 912-13; *Delgado v. Jones*, 282 F.3d 511, 520-21 (7th Cir.2002); *Mitchell v. Randolph*, 215 F.3d 753, 757-58 (7th Cir. 2000).

6. The following cases against Trustees of Purdue University are related cases.
   a. Eisenstein, 2:07cv00294-PRC
   b. Falk 2:13cv00159-JTM-PRL
   c. Whittington 2:09cv00009-APR

The commonality in these cases is the University targeted each faculty member for removal for their position in egregious and malicious ways. Eisenstein at survived at Purdue Calumet because he had tenure and was in many ways at the height of his career. Whittington obtained tenure because her lawsuit was in the courts during the tenure process. Falk is currently in open court and the University has worked very hard to have him removed from his position for as long as Plaintiff has known him.

Quoting Maria Longas, Full Professor of Chemistry-Biochemistry at Purdue University Calumet is a comment made to plaintiff in 2010-2011; "Megan Picket got tenure because the University could not catch her on anything, not because of her performance." What this means is tenure and survival at the University is not based on quality, contributions and education but whether you are liked and can be "caught." Megan Picket was not liked by some members of the administration and some faculty members because of a gender marker change from male to female. Eisenstein was not liked because he made public remarks critical of the university through various media channels. Whittington was not liked because she was a strong, smart female in a department primarily made up of traditional men and she used the Purdue systems to stand up for herself.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. Sec. 1331 and 28 U.S.C.

Sec. 1343 and its pendent jurisdiction over state claims.

7. Venue is proper in this District under 28 U.S.C. § 1391(b), as the actions and allegations

for most of the plaintiffs arose in the Northern District of Indiana. Plaintiff and Defendants

resided in Indiana at the time of said allegations. Currently Plaintiff resides in Illinois.

8. Plaintiff has satisfied the obligation to exhaust all administrative remedies. Doe asked for relief in Spring of 2013 through Attorney of the University Trice, Esq and previously through Purdue Attorney Klingerman, Esq and the administration refused to talk settlement. Doe filed a demand letter which was not responded to by the deadline of August 30, 2013, 3 formal complaints and 2 grievances regarding decisions to deny promotion and tenure. Doe did not obtain any relief. Plaintiff asked Police Chief Anthony Martin to question the students, he refused on the basis that his contract didn't allow it.

9. Plaintiff wrote on or about 20DEC07, 05MAR09 and on or about March-April 2011 to Purdue University President Córdova ("Cordova") asking for relief related to retaliation, hatred and pay for work performed and in the latest letter Doe asked for relief by discussions with university council. No response was given by the Cordova. Yet, Cordova responded to a letter written by a community member complimenting Plaintiff's teaching and Cordova sent a memorandum back about how she was pleased about Plaintiff's work. Cordova works for the board and the board was terminating her contract. Thus responsibility sets on the board.

10. Plaintiff wrote to Luis Lewin ("Lewin") in and about June 2011 regarding medical claims not covered in appropriate categories by CIGNA and no response was given, yet there were conversations between officials at CIGNA and Purdue Calumet by email and verbal to assist in getting plaintiff medical coverage. All internal and external procedures through CIGNA were completed. PU is self-insured and holds responsibility to ensuring CIGNA carries out the administration of benefits contract correctly. PU is responsible for the defining of the contract that CIGNA administrates. It is against the civil rights act to deny coverage for "Transgendered Surgeries" the term used in Purdue's Health Package.

Page **7** of **70**

11.     Plaintiff contacted PUC Council Trent Klingerman ("Klingerman"), 22JUN09, and proposed relief. Chancellor Cohen ("Cohen") refused to discuss relief. Klingerman was also copied on many e-mails with Cohen regarding the formal complaints to find a remedy that would create relief. No response was given.

12.     On 26FEB10, Plaintiff wrote to all The Trustees of Purdue University, specifically to Purdue Trustee Mamon Powers who has a company near PUC, Governor Mitch Daniel (11NOV09), the Attorney General's Office (Greg Zoehler, 11NOV09) and the Attorney General's tort office (11NOV09, Micheal Ward on 09FEB10). At a later date, Plaintiff, also called the Merriville, IN FBI Office for assistance. No relief was given and nobody started an investigation.

13.     This is a constitutional claim being submitted before the 2 year limit, if the limit is based on employment time at Purdue University. However, the harassment continued after Plaintiff left the university because of denial of tenure and working on a terminal contract. Nathan Dodge, whom contacted me by phone in Jan-May 2012 and asked me where plaintiff lived. He had no other agenda but to know where I lived. A month later he made a hang up call about 3:00 am in the morning. In October, 2011, faculty at PUC made a mess out of a letter of recommendation that was requested of me. Andrew Wasowitz looked up my linked in account soon after contacting Debrah Trice, Attorney for Purdue University regarding plaintiff filing on February 26, 2013. There was no reason for Wasowitz to look up Plaintiff except for the purpose of spying.

## PARTIES

14. Plaintiff has national origin East Indian, race white. Doe was born in the United States with a primary residence in Indiana during the relevant period. Doe has a Ph.D. degree in Chemical Engineering with extensive educational and practical as well as educational experience in Analytical Chemistry. Doe's Ph.D. degree was a result of a joint agreement between the Departments of Chemical Engineering and Analytical Chemistry. Doe was a leading international expert in the field of chromatography, separation science and downstream processing. Doe has received numerous invitations to International Conferences and National Science Foundation grants to learn liquid chromatography-mass spectrometry. Doe met PUC's strategic initiatives during Doe's employment at PUC.

15. Doe was born heterosexual male with a gender marker of female. In May 2009 - August 2009; Doe, legally changed gender marker and name. Since, passport, social security card and birth certificate has been changed to retrospectively identify correct birth gender and name change.

16. Doe was employed by Purdue University from August 2005 to September 2011.

17. Defendants are the Trustees of Purdue University having 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year. Purdue University Calumet (PUC) is a satellite campus, and Purdue West Lafayette (PUWL) the flagship campus. Both are governed by The Trustees of Purdue University.

18. MITCH DANIELS was employed as the Governor of the State of Indiana in the relevant period. Currently, he is the President of Purdue University.

19.     MAMON POWERS was on the Board of Trustees and represented the Board the Purdue Calumet convocation ceremonies. He was also informed of the points in this complaint and did nothing at the final Board of Trustee's meeting to approve all tenure applications.

20.     ANTHONY MARTIN is employed as Chief of Police Purdue University Calumet during the relevant times which required his involvement.

21.     HOWARD COHEN is Chancellor of Purdue University Calumet during all relevant times has held this position for 10 years, until on or about July 2011, after which he has publically announced he will teach part time at PUC after a short break.

22.     RALPH V. ROGERS is Vice-Chancellor of Academic Affairs ("VCAA") at PUC and his relevant times from the commencement of his employment on or around the July 2008 and he currently holds this position. Prior to Ralph V. Rogers ("Rogers"), Nabil Ibrahim was VCAA from on or about June 2003 to on or about October 2007 after which he took a position as Chancellor of Abu Dhabi University. [5] Peggy Gerard, Dean of the School of Nursing, held the interim VCAA position from on or about October 2007 to on or about June 2008, until Rogers employment commenced. Peggy Gerard then she returned to her position as Dean of the School of Nursing.

23.     DANIEL SUSAN was Dean of the School of EMS and Full Professor of Physics at PUC starting on or around August 2007[6] to on or about December 10, 2010. Prior to coming to Purdue Suson was chair atTexas A&M University, Kingsville, TX. Under duress, Daniel Suson ("Suson") was removed from his position as Dean of the School of Engineering, Math and Science ("EMS") and returned to faculty in the capacity of Full Professor on or around

---

[5] http://media.umassp.edu/massedu/search/Ibrahim.pdf  and http://www.adu.ac.ae/en/article/dr-nabil-ibrahim.html both downloaded 17JUL11
[6] http://danielsuson.com/work.html downloaded 17JUL11

December 2010 in the Department of C&P. During the academic semester of the Fall of 2011 he holds the position of acting, interim chair of the Department of C&P while the interim chair of the Department of C&P Shawn Slavin is on sabbatical. Suson has been employed by Purdue University during the relevant times of his employment at PUC in various capacities. Suson was replaced by interim Dean Mike Henson, chair of the Department of Biology, a Department within the School of EMS.

24. MICHAEL W. PELTER is Associate Professor at Purdue University Calumet, during the relevant times has held this position. He is also the husband of Liberty Pelter. He was interim chair of the Department of C&P from on or about Summer 2001 to summer 2004, prior to Doe's employment.

25. LIBERTY S. PELTER was employed by Purdue University during the relevant times has held various positions. In or around the academic year 2001-2002 and 2002-2003, she was employed in a position in the office of Dean of EMS under Mike Gealt (Doe's hiring dean). She was hired as a tenure track assistant professor academic year 2003-2004. She went up for P&T in academic year 2007-2008 receiving promotion to Associate Professor with tenure at PUC. She is the wife of Michael Pelter.

26. HAROLD W. PINNICK has been employed by Purdue University as Chair and Full Professor of the Department of C&P from on or about July 2004 to on or about April 2009. Under duress, he was removed from as chair and returned to a position of Full Professor in the Department of C&P at PUC. During all relevant times holding positions of various capacities within the Department of C&P at PUC. Pinnick was Doe's hiring chair. Shawn Slavin was voted and approved as interim Chair of the Department of C&P.

Page **11** of **70**

27. KRAIG KMIOTEK was a student at PUC who performed research with Mike Pelter and Libbie Pelter during the time period of when he turned 21 to when he graduated with a BS in Chemistry in May 2010 and then continued to perform research with Libbie and Mike Pelter during the summer around the date of July 2011. This is the relevant time period. Prior to turning 21, he worked on Doe's NSF contract for 1 semester. He took Doe's Analytical Chemistry I and II class as well as other classes to complete his degree at PUC. He is pursued graduate studies at the University of Texas, Austin and now is working in a private company.

28. DANIEL POP was a student at PUC who took Analytical Chemistry with Doe and performed research with Doe for 1 semester. This is in the relevant time period. He graduated with a BS at PUC and continued with an advanced degree in the Biology Department.

29. NATHEN DODGE was a student at Purdue University Calumet. He took several courses under Doe as well as performed undergraduate research. Then he performed undergraduate research under Professor Pinnick ("Pinnick"). Initially, he was not degree seeking, but was taking courses to get into medical school. When he did not get into medical school, he obtained a degree from PUC in Chemistry succumbing to pressures from Pinnick and the Pelters ("Libbie Pelter and Mike Pelter").

30. ANDREW WASOWITZ is a former Student Purdue University Calumet. He was close to the Pelter's and was under their influence.

31. KONSTANTINA SOTIROGLUE MAGINAS is a former student and instructor at Purdue University Calumet. She took an on-line class and performed some research with the plaintiff. Afterwords she worked with Pinnick and possibly also the Pelters.

## RELATED COURT CASES

32.     An ongoing case of *Whittington v. Trustees of Purdue University*, 2:09cv009RL is relevant based on allegations of retaliation, a hostile work environment and faculty speaking with students about other faculty.     Differences between this case and this filing are several: in Whittington's EEO complaint, Cohen overruled the department recommendation to deny Whittington tenure, found in favor that she was not given equal pay for equal work and found in favor that and that she did work in a hostile work environment.    Purdue compensated Whittington and approved her tenure.   Whittington worked in the School of Technology under Dean Niaz Latif (who previously was employed at PUWL as an assistant Dean and is well versed in Purdue policy).   Deans Latif and Suson started their employment the same summer (summer 2007).   During the time period that Whittington's case was in court, her husband Mr. Kimberly Nankivell received P&T in Academic Year 2010-2011, while Plaintiff was denied the same year, Plaintiff's penultimate year.

33.     In the case of *Defelice v. Lerner et.al.* in the Lake Superior Court of Crown Point 45C010503CT0048, the issue of faculty using students as spies and accepting the student's comments is a continuing theme that goes ignored by PUC.

34.     In *Cobbs v. Moore*, case no. 3:05cv758 a complex case surrounding retaliation against Cobbs for serving as a witness against VSU-Eddie Moore, direct evidence of retaliation by removal of Cobb's from her position to be filled by the girlfriend of VSU's Provost Thomas at the time.   Another example is *Chappell v. Virginia State University* in 3:07-cv-00389 and Ehlert v. Virginia State University case no. 3:07cv765 was a reverse-discrimination against two  white faculty member.   Chappell case was dismissed as she found other employment opportunities. Another example is *Olusoga v. Virginia State University*, case no. 3:05-cv-00678, (settled in

Page **13** of **70**

court) and *Amaram v. Virginia State University*, case # 3:07-cv-00396 are discrimination cases against Black Africans by VSU using post tenure review. Most recently *Amr v. Virginia State University*, case number 3:10cv787 (originally filed 15OCT07, but not served) has allegations of administrators using students to tamper with plaintiff's paper in an effort to show the plaintiff plagiarized as well as allegations of discrimination  leading to damages.

35.     In the case of *Eisenstein v. Purdue University Board of Trustees*, a settlement agreement was achieved in June 2008.  The case concerns topics of due process (e.g. not being able to confront the witness), harassment and retaliation by the administration, and concerns issues of academic freedom or freedom of speech as Eisenstein has been publically critical of Cohen's comments and decisions in, for example, the newspaper. Cohen was chancellor in the relevant times of this case.  Eisenstein is faculty in History and Political Science at PUC.

36.     The case of *Hentea v. Purdue University Calumet* 2:04cv526RL is a case filed 01Sept05 having allegations of denial of tenure and promotion due to teaching because of discrimination based on age, gender, national origin, harassment by the administration, retaliation and violations of freedom of speech.  This case illustrates how PUC uses students to damage other faculty and their employment status. Cohen was the chancellor in the relevant time of the case. The defendants prevailed in summary judgment.

37.     In the case of *Raoufi v. Connors* in the United States District Court, Northern District of Indiana (Hammond, IN Division) 2:02cv505 Raoufi was denied recommendation for P&T due to professional differences by his department in the School of Technology. This is not a reason allowed by policy for denial.  Dennis Korcheck had the authority to recommend Raoufi for promotion and tenure, but was "powerless to do anything.  Cohen notified Raufi he would not be

recommended for P&T even though he had the power to do so. Both parties agreed to dismiss the case.

38.    In the case of *Elgowainy v. Purdue University*, direct evidence was provided that the plaintiff was not hired for a teaching position based on race at PUC. The judge denied Purdue summary judgment.

39.    The case *of Jew v. The University of Iowa* ,749 F. Supp. 946; 1990 U.S. Dist. LEXIS 15128 shows the level of negligence, inaction, long lasting ruthless and gruesome behavior a university allows to defend senior faculty and dysfunctional system at the cost of the plaintiff. The plaintiff won damages in this case and the judge's memorandum shows clearly the unlawful actions of the university.    In this case, Jew was tenured.    The Courts opinion goes further regarding non-tenured faculty.

> One of the most significant decisions a university makes is the decision to grant or withhold tenure.  In that decision the University determines "for itself on academic grounds who may teach." Sweezy v. New Hampshire, 354 U.S. 234, 263, [**52] 1 L. Ed. 2d 1311, 77 S. Ct. 1203 (1957) (Frankfurter, J., concurring in result) (quoting from a statement of a conference of senior scholars from the University of Cape Town and the University of the Witwatersrand, including A. v. d. S. Centlivres and Richard Feetham, as Chancellors of the respective universities). Although tenure decisions are part of the heart of academic freedom, academic freedom does not include the freedom to discriminate against tenure candidates on the basis of sex. Brown v. Trustees of Boston University, 891 F.2d 337, 360 (1st Cir. 1989), cert. denied, 496 U.S. 937, 110 L. Ed. 2d 664, 110 S. Ct. 3217 (1990). The Brown Court went on to state that "to deny tenure because of the intrusiveness of the remedy and because of the University's interest in making its own tenure decisions would frustrate Title VII's purpose of 'making persons whole for injuries suffered through past discrimination.' Albemarle Paper Co., 422 U.S. at 421, 95 S. Ct. at 2373."

The court's opinion below supports punitive damages.

> The Supreme Court recently, in *University of Pennsylvania v. EEOC*, 493 U.S. 182, 107 L. Ed. 2d 571, 110 S. Ct. 577, 582 (1990).
> When Title VII was enacted originally in 1964, it exempted an "educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution." § 702, 78 Stat. 255. Eight years later, Congress [**51] eliminated that specific exemption by enacting § 3 of the Equal Employment Opportunity Act of 1972, 86 Stat. 103. This extension of Title VII was Congress' considered response to the widespread and compelling problem of invidious discrimination in educational institutions. The

House Report focused specifically on discrimination in higher education, including the lack of access for women and minorities to higher ranking (*i.e.*, tenured) academic positions. See H.R.Rep. No. 92-238, pp. 19-20 (1971), U.S.Code Cong. & Admin.News 1972, pp. 2137, 2154-2155. significantly, opponents of the extension claimed that enforcement of Title VII would weaken institutions of higher education by interfering with decisions to hire and promote faculty members. Petitioner therefore cannot seriously contend that Congress was oblivious to concerns of academic autonomy when it abandoned the exemption for educational institutions.

40.     These cases show the degree in which universities are willing to go to remove a faculty member without shame and with intent to harm in malicious ways.

41.     These cases are related in the commonality of evidence. Use of the random system for assignment of judges according to common practice is expected.


## PRIOR HISTORY

### Plaintiff

42. Doe has been subject to discrimination, harassment due to gender stereotypes, based on gender, religion, race and national origin as well as other unlawful behaviors.  This will be documented separately as privileged information.

   a.   **Defendant**

43.  PUC has a history of not following policy.  With respect to promotion and tenure ("P&T"), PUC has few policies and procedures in place, particularly within the school of Engineering, Math and Science as demonstrated in historical events listed below.

   a.   Universities as institutions historically have a great deal of autonomy and courts are reluctant to substitute their judgments for those of academic professionals.  This has changed in the recent past as more faculty go to the courts for fair adjudication.

   b.   Universities have legal assistance to protect administrators and faculty regarding decision making and behavior whether or not litigation is ongoing.  PU uses the firm

Page **16** of **70**

Stuart and Branigin for legal work from attending Board of Trustees meetings to supporting the satellite campuses such as PUC. Trenten Klingerman and-or Debra Trice have been the representing attorney (s) litigated virtually all if not all the cases during the period of Cohen's appointment at Chancellor of PUC.

c.  Courts rarely interfere in the institution's interpretation of the criteria established for reappointment, promotion, or tenure.  In Doe's department, Chemistry and Physics (C&P) and the School of Engineering, Math and Science (EMS), there is no policy for promotion and tenure criteria and there is no policy for how tenure and promotion documents are organized.  Historical momentum, example documents from those that were approved for P&T, and reviews by superiors the way the P&T document is organized.

d.  Former PUC Chancellor Howard Cohen ("Cohen") instituted a policy of non-smoking.  Nonsmoking signs were placed on the campus grounds.  Cohen issued several memorandums saying this policy will not be followed in concern for student's reactions.

e.  PUC has a policy regard grants and contracts where part of the indirect costs (45% of the cost of equipment, salaries etc.) are returned to the faculty member to pay for release time during the semester.  Doe and others have been denied this release time. Doe stood up against the violations of rights and was ultimately given the release time. Not long after, the post-Award director was let go.

f.  PUC has policies regarding hiring.  When former Dean Suson was hiring an open position, targeting the hiring of Robert Kramer, many attempts were made to bypass the human resource requirements.  Until tenure track faculty member on the hiring

committee, Robert Napora, physics tenure track assistant professor in the Department of Chemistry and Physics ("C&P"), reported the violations to the EEO officer, Suson did not begin to follow policy. There is a history of litigation regarding hiring policies, *Elgowainy v. Purdue Calumet* 2:03CV-161-JM, Northern District of Indiana, Hammond Division.

g. In the Department of C&P, 3 physics faculty members are from the same Ph.D. advisor at Indiana University Bloomington: Shawn Slavin, Adam Rengstorf and Megan Pickett (resigned from PUC in or about around the year 2006 to forward her career in Physics).

h. Associate Professor of Chemistry and interim chair of the Department of C&P Mike Pelter held this position when Liberty Pelter ("Libbie Pelter"), his wife, was hired as assistant professor. Libbie Pelter and Mike Pelter virtually always sit together at department meetings. To the best of Plaintiff's knowledge, from postings of publications on the board in front of the C&P office, the publications of Mike Pelter are always joint with those of Libie Peltert. Libbie Pelter has not received independent funding as Principal Investigator (PI), but is always joint with a senior faculty member. She is a coauthor or receives funds from the grants of other PI's. Libbie and Mike Pelter are commonly referred to as the "Pelters" because they act in unison. This is different from other married couples in the School of EMS.

i. Attempts to create department, school and university policies for teaching evaluations have failed since the system of using ~8 questions (called the "cafeteria system) was dismantled in and about 2004. The proposal for teaching evaluation policy for C&P coming from a Department of C&P committee directed by Joe

Bularzik was voted down (around the year of 2007). Neither further discussion nor committee was assembled after. Furthermore, student evaluations do not follow any kind of chain of custody.

j.    When going up for P&T, policies in EMS regarding external letters of recommendation did not exist until Plaintiff wrote a formal complaint-grievance alleging Plaintiff's external letters were not included by the Chair with the P&T documents provided by Plaintiff. Upon request of the letters, Pinnick said he lost the letters.

k.    In the Department of C&P, it is common practice to identify individuals into various committees at the department and school level by vote in the department meeting.

l.    The EEO office at PUC is an open door to discuss improprieties via voice or e-mail. Victor Holden, EEO officer, asked Plaintiff not to write to him anymore, a violation of policy. Once pointed out Victor Holden apologized.

m.  There is no policy, standards nor training regarding the boundaries between students and faculty conversations regarding the performance of another faculty member and its impact on that faculty member's employment.

n.    There is no policy or training for students to fill out faculty evaluation forms.

o.    In the period 2004-2010 Drs. Joe Bularzik, Libbie Pelter, Shawn Slavin, Adam Rengstorf, Neeti Parashar, Megan Pickett and Robert Kramer received P&T in the Department of P&T. Plaintiff did not, nor in 2011.

p.    The following faculty in the C&P department went up and received P&T prior to their penultimate year ("early"). Megan Pickett (2nd), Neeti Parashar (~2nd), Adam

Rengstorf ($\sim4^{th}$), Robert Kramer ($\sim2^{nd}$), Joe Bularzik (5th), Libbie Pelter (5th) and Shawn Slavin (5th). These years are written to the best of Plaintiff's knowledge for the purpose of informing the court the common nature in the Department of C&P to go up P&T prior to the penultimate year (6th year). The exact years will be obtained in discovery. Many faculty are hired with experience, thus waiting 6 years for the opportunities provided by P&T (e.g. security, salary, career opportunities, service opportunities) is not economical for the entry level salaries.

q.   VCAA Rogers in an around Academic year 2010 publically discussed and notified the administration and faculty that he did not want any more P&T documents going up for "early" promotions.

r.   Robert Napora went up for P&T in his 3rd year (on or about Academic Year 2010-2011). Many deviations from common practice occurred. His high teaching evaluation scores were interpreted as questionable by Shawn Slavin. His P&T document went up to either the university or school committee through an abnormal and fortuitous process. Discussions of his not receiving tenure were in part argued on the basis that Neeti Parashar went up early and there was regret about that decision, so Rob Napora was asked by the VCAA to wait until his penultimate year (6th). Rob Napora has since submitted his resignation from PUC.

s.   On two occasions, one in the time frame of 2007-2008 and a second in spring of 2011, Evert Ting, Full Professor in Biology, said she would not ever serve on the C&P Department committee even if asked because the committee does not conform to the rules.

t.   Libbie Pelter voiced to Plaintiff in or about 2006 that part of her strategy to P&T was to keep her head low, stay under the radar and be quiet. Libbie Pelter went up for P&T on or about the academic years 2007-2008, the same year as Shawn Slavin .

u.   When Neeti Parashar went up for P&T it was voiced clearly by Cathy Murphy, Chair and Full Professor in the Mathematics and Computer Science Department, interim Dean of EMS for 1 year (academic year 2006-2007) that personality is to play no role in the decision of P&T that it is only the content of the document submitted.

v.   In about 2010, PUC changed student identification numbers from social security numbers to unique numbers.  When Plaintiff started as an undergraduate in 1979, student identification numbers were not the social security number, but a unique identifier. PUC is behind the times.

The paragraphs above demonstrate that PUC violates its own policies knowingly. This case is being brought to the attention of the court because of the intent to do harm, the intent to do malice, a deliberate effort to target Plaintiff and to unlawfully remove Plaintiff from employment at PUC by denial of P&T.

## STATEMENT OF FACTS

1.  It is common knowledge at PUC and other universities that have an equal or higher ranking that tenure track faculty are not to speak against the status quo.  It is common knowledge at PUC that faculty going up to Full Professor must be in political alignment with the administration, including doing the ugly jobs requested by the administration and to protect the administration regardless of their ethical, moral, intellectual or legal impact.

2. Doe was in strategic and political alignment with PUC. However, the discrimination that started with Harold Pinnick and spread to other faculty in the department such as Michael Pelter and Libbie Pelter. It spread to students where Kraig Kmiotek, Daniel Pop, Nathan Dodge, Danial Pop, Andrew Wasowitz and Konstatina Sortiroglue were specifically involved in targeting Plaintiff. Upon filing formal complaints and grievances the Administration consisting of Daniel Suson, Ralph Rogers, Howard Cohen did nothing. Furthermore reporting the actions of the university to Mitch Daniels and the Board of Trustees, no response was made.

3. At PUC, the chair works at the will of the Dean, the Dean at the will of the VCAA and the VCAA at the will of the Chancellor and so forth up the chain of command.

4. Definitions: Complaints to the EEO office surround issues of behavior. Grievances surround disagreement with decisions.

5. One of the most significant decisions a university makes is the decision to grant or withhold tenure.

6. At PUC, the faculty senate has little to no independent autonomy as the upper administration is integral to the faculty senate meetings and discussions. The LASS Counsel is an independent entity of the university administration as explained to me by Alan Spector, my grievance advocate.

7. The job of the EEO officer has an inherent conflict of interest. One job is to protect the administration from unlawful conduct. A second job is to run a fair, just and process oriented investigations. The EEO officer reports to human resources which reports to the Chancellor.

Page **22** of **70**

## Complaints and Grievances

8. In the period of 2007-2010, Plaintiff filed 2 formal grievances for denial of P&T and 3 formal complaints via the PUC EEO office for unlawful, discriminatory, harassing, isolating behaviors and for decisions made on those behaviors. Cohen filed 1 formal complaint against Plaintiff for conduct.

9. The first formal complaint filed on or about 01AUG07 and amended on or about 21AUG07 was submitted to Howard Cohen ("Cohen"), Chancellor of Purdue University Calumet, against my hiring supervisor Chair Pinnick based on verbal harassment of Plaintiff, assignment of courses not consistent with Plaintiff's title and position with the intent of giving Plaintiff a terminal contract and actions performed by Pinnick that hampered Plaintiff's ability to perform job.

10. On 10OCT07, Cohen substantiated the complaint as rising to the level of harassment with respect to the assignment of courses.  Cohen also stated that Pinnick's administrative and managerial practices are not creating a supportive environment to Plaintiff.

11. On 04JAN08, Plaintiff makes a request permission from Cohen regarding the formal complaint hearing to (a) attend the entire hearing to listen to the witnesses and investigators, (b) question the witnesses and investigator and (c) and tape hearing.  Cohen denies all 3 requests.

12. The second formal complaint was submitted on or about 31MAR09 Plaintiff submitted to Cohen a formal complaint for (a) retaliation for pre-planned denial of Plaintiff's P&T document (department committee unanimously voted against 0 in favor, 7 against) including lack of support for P&T and not telling the truth about accepted referred publications on Presidents Form 36  (Form 36 is used to summarize comments for P&T

across the committees), excluding critical information such as Plaintiff's written cover letter and including external letters Plaintiff's P&T document, (b) intimidation and harassment associated with opening internal mail, unannounced classroom visits for the purpose of evaluation on 24OCT08, in action due to further incidences of tampering with Plaintiff's research equipment, (c) Lack of pay for work performed for teaching on-line CHM599 course on Analytical and Process Chromatography and salary savings from Daiso External Grant, (d) continued intimidation and harassment by demeaning and admonishing verbal remarks and (e) isolation from the department.

13. The hearing took place on or around September 2009 and was unsubstantiated. About 10 min prior to the start of the hearing Plaintiff's home alarm system was triggered by opening of the back sliding back door and the motion sensor alarm in the basement. Because no rescheduling of the hearing is allowed, Plaintiff could not go home. This is marked as a retaliatory event.

14. In May-June 2009 Plaintiff a third grievance was submitted against Mike Pelter reporting the tampering of classroom technology and the investigation was performed in the summer of 2009 while Plaintiff was working on a National Science Foundation-Department of Energy Louis Stokes Alliance for Minorities Program (NSF-DOE LSAMP) at Oak Ridge National Labs to advance his skills in Liquid Chromatograpy - Mass Spectrometry (LC-MS) and assisting Gary van Berkle, a premier scientist in this field, in analyzing chemicals from a surface and the next summer in identifying metabolites to enhance the growth of switch grass for use in bioenergy. The complaint went unsubstantiated. Mike Pelter was assigned the coordinator position by Dean Dan Suson. Plaintiff was required to bring freshman chemistry students to Mike Pelter for

advising and work with Mike Pelter as Plaintiff was a functioning member of the General Chemistry Committee. Mike Pelter complained to interim EEO Officer Mrs. Holden (wife of Victor Holden, Victor had resigned from PUC) asking Plaintiff not to speak with him and only have contract by e-mail. The EEO officer approved Mike Pelters request. Since Plaintiff was isolated from Mike Pelter. These actions are also retaliatory in nature.

15. The policy of the investigations of all formal complaints do not allow rebuttal to witness remarks and complaints are strictly confidential. The hearings last 30 min and no materials are allowed to be distributed. The plaintiff and defendants have separate hearing times and do not see or hear each other. This policy runs against court local rules and does not allow both sides to be heard.

16. At informal grievances initiated by Plaintiff, both parties are allowed an advocate. Plaintiff had Dr Alan Spector, Full Professor in Behavioral Science. Spector was recommended by Victor Holden, EEO officer at the time, as one of the few faculty that would help me in standing up against wrongs against faculty. Pinnick had Dr. Robert Rivers, Dean of the School of Education. Pinnick originally wanted asked Dean Suson, but due to being his supervisor, he declined and recommended Robert Rivers. Victor Holden, EEO officer, administered the informal grievance hearing. These advocates continued to serve at Plaintiff's formal grievance hearing. At the informal grievance hearing, the policy states that advocates are not to speak at the hearing except to their respective individuals. At the 1st informal grievance hearing, both advocates spoke and discussed openly with all attendee's. The informal grievance hearing ended with an agreement that Plaintiff should be recommended for promotion and tenure. VCAA Roger's overruled this agreement. This action is retaliatory.

17. A formal grievance hearing initiated by Plaintiff lead by Dr. Lori Feldman, Full Professor, (with several committee members) was held. All witnesses, brought from both sides, sat in a chair at the front middle of the room, except Pinnick. Each party asked questions and then the witnesses left. When it was Pinnick's turn to be a witness, the committee did not have Pinnick sit in the chair and allow Plaintiff to question him. Instead, the committee instructed a discussion format. The rules of investigation were not followed. This action is retaliatory.

18. The policy for formal grievances have a substantial and a procedural component. Dr. Roger's stated that the substantial portion was not to be covered in the formal grievance and Plaintiff was not allowed to address the substantial portion of the grievance document submitted. In Spring 2011, about March, Cohen announced via e-mail to PUC that grievances will not cover substantial complaints. This action is retaliatory.

19. All Deans serve on the university committee for P&T document review. Dean Rivers served on Plaintiff's P&T university committee and did not recuse himself after being Pinnick's advocate. At a later time Dean Rivers told Plaintiff a comment to the effect that Plaintiff did not belong at the University because of grievances and complaints filed. All P&T committee meetings are held in private and what is spoken by individuals is not recorded and intentionally not documented. The university committee summary discussion is not provided to candidates for P&T nor the vote count unlike the school and department P&T committee meetings. This action is discriminatory and retaliatory.

20. On 16JAN08 Cohen reports findings of investigation that insufficient material harm in verbal remarks and was found unsubstantiated. Payment for work performed is the responsibility of George Nnanna and not Pinnick. The post award department at PUC did

nothing to resolve the financial and contractual matter. These actions are both discriminatory and retaliatory.

21. In September 2008, in the hearing of the first formal complaint, Plaintiff attempted to distribute an approximately 20 page document. Cohen denied distribution. These actions do not follow administrative procedures and were discriminatory and retaliatory.

**Isolation Leading to P&T Inconsistent Decision Making**

22. In July 2005, Plaintiff had moved and was living in Munster, IN. Plaintiff asked Pinnick use of an office to prepare for classes. No office nor space was made available to Plaintiff.

23. Plaintiff was given an office upon the start of the contract on the opposite side of the C&P department, adjacent to the Biology Department. The Department of Graphics Technology was between C&P and Biology, where Whittington, Roller and Nankivell as well as others worked.

24. Plaintiff did not receive a PUC campus computer until several weeks after Plaintiff's first semester of employment started. Alice Kolakowska also did not receive a campus computer until weeks after the semester started.

25. In the years 2009, 2010 to May 2011, the following faculty would intentionally turn their head to the corridor wall or start to walk in the opposite direction to avoid Plaintiff as Plaintiff passed them. Adam Rengstorf, Cathy Murphy, Chenn Zhou, Libbie Pelter, Mike Pelter, Maria Longas, Dan Suson, Gretchen Wolf, Kraig Kmiotek (student), Dan Pop (student), Konstantina Sortiroglue (student) and Andrew Wasowitz (student).

26. Plaintiff was not asked to sit on committees of significant importance. In or about academic year 2006-2007, Plaintiff self-nominated to sit on the C&P Master's Committee and was accepted in the C&P department meeting. Within the year Plaintiff was replaced by

Libbie Pelter without vote and without notice. Plaintiff was voted to serve on the department policy committee (approximate name) and was replaced by Libbie Pelter secretly without vote and without approval of the department meeting minutes which are voted for and approved every meeting that Plaintiff can remember except this one.

27. Student Research Day Spring'08, Plaintiff gave a lecture and the students (last name) Wazowitz, Johnson and Konstantina Sortiroglu said Hal Pinnick recommended they not attend the session in which Plaintiff spoke, saying It wasn't important.

28. Ryan Johnson communicated to Plaintiff in the student study lounge, when the lounge was in the basement of the Gyte building that Mike Pelter told him Plaintiff was a bad teacher.

29. A few months after the death of Plaintiff's mother, Februry 2011, Grechan Wolf apologized for not having me participate in Science Olympiad because she did not want to "get involved." Since Mike Pelter became chemistry coordinator for Science Olympiad, replacing Joe Bularzik, Plaintiff was not invited to be a judge or participate in any fashion. One year, the Physics Coordinator asked Plaintiff to judge and prepare the event Pentathlon. There were no complaints about Plaintiff's role and function in Science Olympiad. In Plaintiff's first year of employment Plaintiff was told by Pinnick, Longas, Mania-Farnell, Kay Rowberg that working Science Olympiad was sufficient to meet the service criterion at the time of tenure and promotion.

30. Joe Bularzik functioned as Chemistry coordinator for Science Olympiad prior to receiving tenure. Yet, Joe Bularzik, per his spoken words, had no publications when he went up for P&T. Joe would say to Plaintiff something like, I just don't know why these reviewers don't find my research publishable. Yet Joe Bularzik received P&T. Joe Bularzik

had a part time position has head of undergraduate research while tenure-track. After Joe Bularzik left that position a decision was made that only tenured professors could hold this position. The P&T common practice says to show excellence in one area, teaching for Joe Bularzik, and strength in another, research. Service becomes important in promotion from associate to Full Professor. Lastly Joe Bularzik said to Plaintiff he had no negative comments in his evaluations. Plaintiff has an affidavit to the contrary.

31. In about academic year 2009-2010 Plaintiff self- nominated to be on the Department Policy and the faculty accepted. A second member was needed, preferably from the equivalent School Committee leading to the choice of either Robert Kramer or Libbie Pelter. Both parties made it clear that they did not want to serve on the committee with Plaintiff at the department meeting. The meeting minutes showed Libbie Pelter was put on the department committee instead of Plaintiff. Plaintiff brought this to the attention of Susan Delatorre who said she would change it. In the next C&P department meeting, Libbie's name had replaced Plaintiff. The department meeting minutes did not go through the procedure for approval as all other department meeting minutes did.

32. Pinnick did not invite Plaintiff to the 2010 Christmas party at his home while the rest of the department was invited.

33. Plaintiff was not engaged in the department in a service role by hiring chair Pinnick. Adam Rengstorf, hired the same year as Plaintiff was put on the teaching evaluation committee with Joe Bularzik, Neeti Parashar and 2 or two other faculty. Adam Rengstorf was put on the

34. Rengstorf in the August 19th, 2010 – 2:15 pm press release said he received

"approximately $125,000 in university and private funding." Shawn Slavin was a strong

Page **29** of **70**

participant in this grant, perhaps as co-PI, and they received their Ph.D. from the same faculty advisor. Shawn Slavin and Adam Rengstorf were friends prior to the later's employment at PUC working in the same area of research.

35. Plaintiff's strategy was to develop an independent research program to add value to PUC's initiatives in scholarship. Plaintiff did not have a department member working in the same area of research. This is a high level of ambition for a 4th tier university like Purdue University Calumet. To accomplish this without university support demonstrates a high level of competence.

36. In Spring-Summer of 2007, when Plaintiff brought the President from the corporate office of Daiso Fine Chemicals in Japan, (several hundred million dollar company) who resides in Japan, Chair Pinnick refused to meet with him. When they fortuitously met in the hallway, Pinnick was wearing shorts and a t-shirt and barely said hi to the President of Daiso Fine Chemicals, Japan. The other administrative personnel, besides chairs, were unfortunately on a retreat. Judith Kaufman, Vice Chancellor for Advancement, gave him a welcome and a small gift. This left a bad impression to the President of an International Company bringing outside money to Purdue.

37. After Plaintiff received funding from Daiso Fine Chemicals, in 2008 in an effort to obtain more funding, the local contact to Daiso was brought to Dean Suson, at the time, Suson was asked by the Daiso representative if he would provide some supplemental support to Plaintiff. Suson said no. Pinnick had already refused to meet with the Daiso representative. Moreover, when Plaintiff received the Daiso grant, Wes Lukoshus promised an immediate press release; however, one was not issue until some 4 months later when Wes Lukoshus was notified of a formal complaint by Plaintiff. Within 2 days the press release was issued.

Page **30** of **70**

38. Rengstorf was invited to facilitate in Howard Cohen's Reading circle on October 14, 2009 on the book "Mistakes Were Made (But Not by Me): Why We Justify Foolish Beliefs, Bad Decisions, and Hurtful Acts." by Carol Tavris and Elliot Aronson.  Entering Cohen's reading circle is difficult. Libbie Pelter received such opportunity in 2008-2009, Radmilla Sarac, hired the same year as Plaintiff in the Biology department received such opportunity in 2007-2008.[7]   Jana Whittington, whom the Chancellor overruled the committees and recommended her P&T to the President of PU and the Board of Trustees, received such opportunity in 2003-2004. Plaintiff never received such opportunities.

39. Despite the fact that Harold Pinnick discriminated against Libbie Pelter, she was able to obtain P&T and survive because she submitted no complaints, she took advantage of Plaintiff's formal complaint and "slipped" the truth in the investigation so she could get P&T.  Libbie Pelter had worked in the EMS deans office and her husband worked in the department, so she was able to acquire enough protection to do well in her career.  Plaintiff was not able to obtain such protection to overcome the discrimination.

40. Rengstorf held a position on one of the grievance committees (exact name to be obtained in discovery).  Plaintiff volunteered to be on the Chancellor's advisory board and Cohen refused.

41. Joe Bularzik, as tenure track faculty in C&P, was strongly supported by Pinnick for the position of Director of Undergraduate Research. This position now requires a tenured faculty member. Pinnick has not supported Plaintiff for any service positions.

42. Neeti Parashar served on the faculty-senate and many other committees yet she did not attend.  She was given credit for this committee work in her P&T decision.

---

[7] http://webs.purduecal.edu/chancellor/past-books/, downloaded 13JUL11

43. Neeti Parashar was given a 2 day a week course schedule most of her time at PUC so she could do research 3 days a week at Argonne National Lab. She had a poor class attendance rate, her high student teaching evaluation scores were questioned, she did not cover the material and still obtained P&T. Because there is no chain of custody for student evaluations, nothing could be proven. Student evaluations are the ownership of the faculty member, so it is against policy to pull the scanned records from operations unless an investigation is initiated.

44. Neeti Parashar and Hal Pinnick had screaming matches that could be heard all the way down the hall where Plaintiff's desk was located.

45. It was announced on March 17, 2008, Shawn Slavin received nomination for the Outstanding Teaching Award. Yet Shawn's P&T committee reports described how he had not made any contributions to teaching methods and received P&T. Plaintiff also received nomination for Outstanding Teaching Award in Spring 2009 and was denied P&T, where in contrast Plaintiff had made enormous contributions to teaching methods that were not acknowledged in the committee reports.

46. Alan Szeto, tenure track faculty, has been invited to give a seminar at Pinnick's-Pelter's (details to be obtained in discovery) senior seminar class. Plaintiff has received no such invitation. Alan Szeto left PUC soon after Plaintiff left on his own before he had applied for tenure and promotion. Alan Szeto saw the egregious and malicious ways of PUC and took a position at another university.

47. It is common practice that P&T documents are submitted to the department committee and they are not allowed to be edited except for minor misspellings. Joe Bularzik was extremely outspoken about his P&T process during the process. Joe Bularzik had multiple,

about 3, revisions to his document prior to it being approved by the department. Revision means, the document was given to Joe Bularzik, then returned to the committee. Plaintiff did not receive such opportunities for revision.

48. After Shawn Slavin turned in his P&T document for contract renewal to the department committee, Longas suggested he submit for P&T and returned his document with her P&T document outline for him to rewrite. Plaintiff was not given opportunities for revisions of P&T document.

49. In the process leading to the hiring of Jatilla van Der Veen, Plaintiff wanted to speak to the candidates. Libbie Pelter told Plaintiff, only those on the committee are allowed to speak and provide input to the candidates. If you interview one candidate, you must interview all or it is not a fair hiring process. In this way, Plaintiff was excluded from all participation in C&P hiring process. Yet, in the hiring of 2 individuals for the EEO position to replace Victor Holden, Plaintiff was welcomed fill out a feedback form from an open question answer session and seminar. The Department chose an external faculty member from another department on hiring committees. During the relevant period the following individuals were hired into the C&P department as assistant professor: Alice Kolakowski, Rob Napora, Robert Kramer and Jatila Van der Veen.

50. Jatila van Der Veen left PUC after her first, Academic year 2008-2009 after receiving negative evaluations from Harold Pinnick and Rob Napora. Yet, in the PUC commencement address given by Cordova, on or about May 2009, spoke about the outstanding record of Jatila van Der Veen in physics. Alice Kolkakowski was not given a renewal of contract. Rob Napora received a tenure track position and Robert Kramer was promoted from a contract

Page 33 of 70

appointment to Full Professor in one year. The women were removed and the men received promotions.

51. A salary adjustment was held to raise academic salaries close to industrial salaries about 2-3 years ago. Plaintiff's salary was not readjusted.

## Removal from Administrative Positions, Returned to Faculty

52. Plaintiff's hiring chair Hal Pinnick ("Pinnick") was replaced by Shawn Slavin. Dr. Leslie Rittenmyer, former head of the faculty senates told me Pinnick was removed because he could not stop making inappropriate remarks and that it was apparent to the entire faculty senate that Pinnick hates women. Yet, Plaintiff has received no relief from Purdue University (PU) as it was Plaintiff's EEO complaint that pointed out Pinnick's inappropriate behavior.

53. Danial Susan was removed as Dean to faculty because he could not meet the needs of Ralph Rogers ("Rogers"). Suson himself told Plaintiff that he was under tremendous duress to define a P&T document in part due to Plaintiff's EEO complaints and Suson was not able to complete this task. Sam Liles at the end of his term as President of the Faculty Senate told Plaintiff, he completed all of his milestones except one, defining a P&T policy.

54. The Dean of EMS and the Chair of C&P are returned to faculty positions in the department of C&P, yet, Plaintiff received no relief PU for unlawful mistreatment.

## Student Evaluations of Instructor Teaching

55. The faculty-senate has a document that says the candidate can define how teaching is evaluated and gave examples. Plaintiff chose using the entire teaching portfolio presented.

56. In 2006-2007, Joe Bularzik, former faculty member in the Department of C&P who received tenure and director of student research, told Plaintiff that the way he obtains high

Page **34** of **70**

student evaluation scores is by eliminating what he believes to be outliers and by intimidating the students in his classroom teaching style.

57. In or about the academic year 2006-2007, the year Joe Bularzik went for P&T, he told Plaintiff that he did not receive any negative student comments, except one which had curse words in it.

58. In a C&P Department meeting, Gretchan Wolf announced that Joe Bularzik had lied on his P&T document regarding credit taken for a course he claimed to have developed and did not.

59. Student teacher evaluation scores are the property of the faculty. There is no policy for faculty to remove individual teaching evaluation scores filled out by students. There is no chain of custody of teaching evaluation score materials. Students are not trained in performing teacher evaluations. Students do not understand their responsibility and the consequences of their teacher evaluations. There is no credibility behind the teaching evaluation score performed by the students.

60. Longas, Full Professor in the Department of C&P, verbalized in a C&P Department meeting that to get teaching evaluation scores above 4 or 4.5 one need to be a cowboy and entertain the students (not teach).

61. Pinnick threatened Plaintiff regarding not getting P&T based on teaching in academic year 2006-2007 and on and off in future years. Pinnick said students in Analytical Chemistry I and Analytical Chemistry II were complaining about Plaintiff's teaching. When Plaintiff asked about specifics, none were provided. When Plaintiff asked for attending training programs, none were provided. When Plaintiff attended the Center for Instructional

Excellence seminars and workshops, Pinnick was critical of this organization with comments that it had no value.

62. There are ways faculty can influence students regarding their opinion of other faculty. Faculty write letters of recommendation to further student's progress. Faculty give students research opportunities. Faculty talk to students and at PUC are allowed to talk about other faculty to students. Faculty can mock other faculty in the classroom at PUC.

63. In the approximate years of 2006, 2007 Joe Bularzik told Plaintiff the way he finds out if the teachers in the department are good is by talking to the students as he has direct contact with students through his position as director of student research. The students talk quite frankly with him about other faculty in the department. Joe Bularzik held as a non-tenured faculty member the position of Head of Undergraduate research and thus had access to students via this position. Since Joe Bularzik term ended, this position requires tenure.

64. Faculty have spoken to students about faculty matters. In a hearing with Chancellor Cohen, Cohen asked Plaintiff for an example of students being involved in faculty matters. Plaintiff gave the example of a student asking Plaintiff if Rob Napora would be the next department head. Plaintiff answered, this is not information you should know about.

65. VCAA Rogers with Sam Liles as witness came to a C&P department meeting and said for decades the C&P department has been dysfunctional. It is time this be put to a stop. He asked the department faculty to take responsibility and fix the problem. Rogers also pointed out that one person's joke may be offensive to another person. He asked faculty to be sensitive to others in this regard.

66. Interim Chair, Shawn Slavin, commented to Plaintiff on several occasions regarding the values reported for student teaching evaluations of faculty in the classroom, at least I know you haven't cheated on your teaching evaluation scores.

67. Anekwe provided direct evidence in an accidental encounter at McDonalds. He asked where Plaintiff was working. Plaintiff answered PUC. Anekwe replied to the effect I'm surprised you are there I was told they were getting rid of you. In the following days Pinnick went to Anekwe's computer science class to have him "hushed."

68. Pinnick has said everybody hired in this department should get tenure during my 1st year and PUC and during my last year.

## P&T Inconsistencies

69. Sam Liles, Associate Professor in the School of technology and during his period as President of the Faculty Senate stated Kim Nankivell (male), Department of Computer Graphic Technology will never get tenure at PUC.

70. In the Fall of Academic year 2010-2011 Sam Liles, Associate Professor in the School of technology, Department of CIT Computer Info Tech Graphics, and former President of the Faculty Senate stated that both Mike Roller and Kim Nankivell both in the same department will obtain tenure, not only one.

71. To the best of my knowledge all of the faculty, except Plaintiff, hired in August 2005 in the School of EMS went up for early P&T and were approved. This statement needs to be confirmed by discovery.

72. In the year on or about 2009-2010, VCAA Rogers sent a memorandum saying he does not want candidates going up for early P&T.

Page **37** of **70**

**Hate**

73. In or about Spring 2007, Pinnick told Plaintiff, there are faculty in the department that hate you. When asked who, he said Mary Ramos, lab technician, retired. When asked which faculty, the conversation referenced Mike Pelter and Libbie Pelter.

74. Alice Kolakowsi, contract assistant professor, wrote to Cohen and Victor Holden, EEO Officer, in exit letter her beliefs that Pinnick hates women.

75. Leslie Rittenmeyer, former head of the faculty senate, told Plaintiff twice once several years before this complaint and a second time in May 2011 that Pinnick hates women. Leslie Rittenmeyer also said that the members of the faculty senate believe Pinnick treats women poorly.

76. Alice Kolakowski and Rob Napora were given 1 year contracts at the same time in the Department of C&P. There were many hallway discussions where Pinnick said these 1 year contracts would be converted into tenure track positions. In the end only, 1 tenure track position was opened, Robert Napora filled it and Alice Kolakowski left the university.

77. Individuals with a female gender marker with tenure track opportunities while Pinnick was chair were given fewer employment opportunities and bigger hurdles to overcome than men. Alice Kolakowski was promised a tenure track position, she was not given one. It was openly discussed that the Physics side of the department was concerned Alice Kolakowski was aggressive and might be another Neeti Parashar. Instead, Rob Napora was offered the position. Jatila Van Der Veen (Jatila) resigned after one year. Jatila told Plaintiff she received a poor review from Pinnick and her co-supervisor in part because

Page **38** of **70**

her concepts of teaching physics and AQUIP from background in California were in conflict with the Dean of Education, Robert Rivers.

78. Plaintiff's first year at Purdue, Pinnick was openly critical of Libbie Pelter regarding her teaching style (use of POGAL) and she was openly critical that Pinnick was an ineffective manager who could get nothing done. In the year prior to going up for P&T, Pinnick was positively supportive that Libbie Pelter would get tenure. She passed the P&T process. During the period Libbie Pelter went up for P&T, Plaintiff had a formal complaint in-process. Libbie Pelter told the investigator that she could not make comments about Pinnick because of his role as chair and its impact on her P&T application.

79. Neeti Parashar and Pinnick had screaming matches that could be heard all the way down the hall when Neeti Parashar was denied P&T the first year she went up. Faculty members with a male gender marker had fewer difficulties.

80. Robert Kramer was hired as an assistant professor and then promoted to full professor with tenure, on or about the following year. Rob Napora reported the inappropriate hiring practices to PUC Human Resources.

**Financial Improprieties**

81. On the date of 24APR07 a contract for $62,380 paying full indirect costs was signed between Daiso fine Chemicals and Purdue University for Plaintiff to perform research from Mid-May 2007 to Mid-May 2008.

82. Under to decision of Dean Daniel Susan the use of funds obtained from the Daiso contract to pay course release in or about Academic 2007-2008 year were denied. That is the university attempted to keep this money until Plaintiff pointed out the unlawful nature

of the decision. A short contract was written giving Plaintiff the funds to pay for course release to work on the grant with the post award administrator at Purdue. Soon after the post award administrator was fired or asked to resign under duress. Drs. Tseng and Choi in the Biology department historical been denied the practice to applying funds owed to them by the procedures of PUC to pay for course release during the academic year. They have historically had to give those funds to the university. They have historically written their budgets to fund their work for summer salary and not take course release in the academic year.

83. Fall 2007 Pinnick and Susan Delattorre ask Plaintiff to accept a check and split it with Plaintiff's student to pay for work performed for the Purdue Water institute. Plaintiff refused because of its legality.

84. On 03DEC07, Plaintiff submitted a formal complaint of retaliation to Cohen against Pinnick for (a) lack of pay for work performed for Plaintiff and Plaintiff's student, for work performed for Water Institute under Director George Nnanna, of the Engineering Department within the School of EMS, (b) Plaintiff was asked to pay student from one check issued to Plaintiff, (c) lack of pay for student working on undergraduate research, (d) lack of addressing security matters with regards to tampering of Plaintiff's research equipment and (e) isolation from the department.

85. On 13DEC07 Dean Daniel Suson ("Suson") forwards Cohen's recommendation of 2 senior faculty as mentors. On 18DEC07 and 08JAN08 Plaintiff writes why Plaintiff needs so many mentors were being assigned. Soon after Cohen withdraws request for Plaintiff to be mentored since no policy was in place and Plaintiff was being targeted with multiple assignments of mentors.

86. On 04JAN08, Plaintiff makes a request permission from Cohen regarding the formal complaint hearing to (a) attend the entire hearing to listen to the witnesses and investigators, (b) question the witnesses and investigator and (c) and tape hearing. Cohen denies all 3 request.

87. In year 2007-2008 Suson in his role of Dean came to my office, sat down and said that if I were to initiate a vote of no confidence against Pinnick, he would have strong feelings against me.

**More Actions of Hate**

88. On 22MAY08 the Riley Center, (either Tamra Bottomlee or kindergarten teacher Sue) preschool program run by Purdue University Calumet, reported Plaintiff's child to the State Child Protective Services as unkempt. Plaintiff and daughter were investigated for 45 days. Child Protective Services sent a letter of finding were unsubstantiated.

89. In or about Aug.-Sept. 2009 Mary Beth Rincon ("Rincon"), at the time head of Human Resources, asked to see Plaintiff in her office. Rincon asked Plaintiff to give up rights to use the men's restroom in the area of the Chemistry and Physics department faculty offices on the 2nd floor of the Gyte building and use the unisex bathroom on the 1st floor of the Gyte building. Regarding the rest of the campus buildings Plaintiff was given accessiblity use the men's restroom. Rincon said the men in Plaintiff's department have complained and she is worried about my safety. Rincon would not want to find me beaten-up in the bathroom in the Gyte Chemistry faculty area. Historically when Megan Pickett, faculty in the C&P department, made a gender marker change form male to female, (sometime between 2001 and 2004) former Dean of EMS Mike Gealt announced that Dr. Pickett was allowed to use the women's restroom.

90. An external-letter policy within the school of EMS was created after Plaintiff pointed out through the EEO process that external letters were improperly managed and were lost upon going up for P&T in Academic year 2008-2009.

91. There is no policy or common process for those denied P&T to be notified of denial. Plaintiff received a letter upon asking Dean Hensen about how one knows if one is denied or approved, and he wrote a specific letter to Plaintiff indicating denial and issuance of a terminal contract.

92. The September 2008 hearing supplementary document was sent to PUC EEO officer Victor Holden and the document was returned, rejected, by USPS mail.

93. In a Chemistry and Physics department meeting in 2008 or 2009, Suson said that tenure faculty cannot be fired as they are completely protected.

94. On 28JUL09, Plaintiff informed  President Cordova of Purdue University and the Board of Trustees of Purdue University via letter, return receipt, of faculty who hate Plaintiff. Plaintiff informed President Cordova of failed discussions with University counsel, Trent Klingerman, to resolve situation.  President Cordova did not respond to letter.

95. At the May 2010 commencement assembly of faculty, staff and administrators, Plaintiff approached Cohen to say hello.  Cohen had not seen Plaintiff since the gender marker change paperwork had gone through human resources. Cohen looked Plaintiff up and down.  This was not a usual behavior for Cohen to look a person up and down.

96. At the May 2010 commencement assembly, Plaintiff met the respected Cordova in an unusual way.  After meeting Cohen, Plaintiff was speaking with Cohen's wife.  Then, all of a sudden the floor opened up and everyone standing around Plaintiff was now 5-10 feet away and an oval with Plaintiff in the center opened.  The respected Cordova

approached Plaintiff and said hello. A short conversation took place. Plaintiff asked
Cordova how she survived being from California in the Midwest. Cordova answered, it is
important to have supporters who protect you. It is not easy.

97. Plaintiff, a tenure-track faculty member submitted 2 formal complaint to Cohen,
investigated through the EEO office, against hiring chair Pinnick for making demeaning
comments (e.g. so you're learning analytical chemistry, looks like you just came into
work, now it is time to party, your [formal complaints] are putting a black cloud over my
head, if you don't stop your complaints I'll see the end of you, etc.) and making
decisions that would lead to Plaintiff receiving a terminal contract.

98. Plaintiff, a tenure-track faculty member submitted 1 formal complaint to Cohen against
tenured, assistant professor Mike Pelter for tampering with Plaintiff's equipment by using
students, Kraig Kmiotek and Daniel Pop. This was investigated by a faculty member.

99. Plaintiff, a tenure track faculty member submitted 2 formal grievances, on or about May
2009 and 2010 in response to decisions that denied Plaintiff tenure and promotion.

100.    After Pinnick was removed from the chair position to faculty, full professor,
Shawn Slavin became interim chair. He said to me, I'm amazed at how many people on
this campus know you. I asked how do they know me. He said by my formal complaints
and grievances.

101.    In an effort to ask for relief and reduce the retaliation associated with filing the
complaints and grievances, Plaintiff wrote to Governor Mitch Daniels, the Indiana
Attorney General's office, all of the Purdue Board of Trustees and spoke with the FBI.
No organization nor individual provided assistance. Plaintiff spoke with university

counsel, Trent Klingerman about the letters written to obtain relief. Trent Klingerman said that Plaintiff did not need to tell him, as the university would be contacted.

102.    The year Neeti Parashar went up for promotion and tenure, to assistant professor, she was questioned on the honesty and accuracy of presentation of her student evaluation scores performed by the students because they were so high. The year Joe Bularsik went up for promotion and tenure to associate professor, he was questioned by the department committee on the honesty and accuracy of presentation of his teaching evaluation scores performed by the students and his statement that only one student wrote a bad written comment. The year Rob Napora went up for promotion and tenure to associate professor, he was question by the chair that his scores were too high due to tampering. Plaintiff was not questioned on the inaccuracy of the scores performed by the students by Slavin as these are good scores typical of faculty.

103.    It is common knowledge that tenure track faculty are to be seen and not heard. This violates Constitution rights according to the first amendment.

104.    Plaintiff voiced via mail, e-mail and verbal unlawful and policy violating behavior within PUC, external to PUC and to public officials.

105.    It is common knowledge at PUC that tenured faculty are "untouchable," regardless of what they do, there are no consequences, the only faculty that can be reprimanded are the tenure track faculty. Suson announced in a department of chemistry meeting that tenured faculty members are totally protected.

106.    In academic year 2008-2009, Plaintiff was unanimously voted against recommendation to promotion and tenure and no reason was given. This was the first year the department committee for P&T had the critical mass to hold only members from

the department of C&P. In academic year 2009-2010 Plaintiff was voted 4-1 in recommendation of P&T at the department level, with 3 C&P faculty recusing themselves (Libbie Pelter, Mike Pelter and Hal Pinnick), but denied at the School of EMS based on service. In academic year 2010-2011, Plaintiff was unanimously voted (7-0), by the P&T committee of the Department of C&P, holding as members only C&P faculty, in Plaintiff's penultimate year, against recommendation for promotion and tenure.

107.     For example, sexual harassment reported against Lash Mapa and Geoffrey Schultz have gone without ramification due to tenure protections.

108.     In 2008, approximately 3 reports were made the PUC police regarding tampering with Plaintiff's research equipment. This included unscrewing fluid lines containing flammable solvents and making high pressure gas cylinders unclosable, a safety hazard.

109.     Requests to Pinnick and Suson to change the lock on the door came with the answer no. Requests to put a camera in the hallway came with the answer no. Requests to identify all individuals with access to the laboratory with the equipment came with the answer no.

110.     Shawn Slavin ("Slavin"), in about 2009, per his statement put cameras in Gyte 240 at the request of Libbie Pelter. Slavin strung the cabling himself hooked the camera up to a storage device that he maintained in his office. The system ceased to perform on or around the date of 15FEB11. Plaintiff reported tampering of research equipment by exchanging of columns in or about March-April. The camera system was not working and did not record this event.

111.     In or around the year 2010, Neeti Parashar requested a camera system upon allegations of her office being broken into. A camera system was installed.

112.     In May 2009, during or prior to graduation week, Jacob Perrine ("Perrine") May
2009 graduate, now Purdue University Department of Chemistry graduate student,
reported to Plaintiff in front of student Joseph Stankovich that Mike Pelter and student,
Kraig Kmiotek, were making the classroom technology in operable. In the Fall semester
2009, they were going to make Plaintiff's class extremely difficult. Libbie Pelter, mentor
for Kraig Kmiotek, did nothing to report these actions. The issue of equipment security
has been reported and policies have not been put in place to ensure federally, state,
corporate or private funded equipment is in a safe environment at Purdue university,
Taleyarkhan v. Purdue University, case number 4:10-cv-0039, U.S. District Court,
Northern District of Indiana, Hammond Division.

113.     In May-June 2009, Plaintiff, in accordance with PUC policy of reporting
information, submitted a formal complaint to have this investigated. Plaintiff asked the
Chief of Police Martin ("Martin") to question the students regarding tampering of
equipment. Martin refused saying his contract doesn't allow him to do this.

114.     In 2007-2008 VCAA Rogers and witness Sam Liles, head of the faculty senate at
the time, came to a Chemistry and Physics department meeting to make the following 2
points (1) one person's joke is another person's insult. Be careful how you say things.
(2) students know too much about the politics of the department. As a faculty it is your
responsibility to stop this.

115.     In or around the date of March-April 2011, Keith Hall ("Hall") discussed with
Slavin concerns of his grades in view of conversations with Plaintiff regarding his
surgeries in the classroom, after class. Hall is about the same age as Plaintiff. Hall was
one of the top two students, by a significant amount, in the class of about 40-60 students.

Hall had a career in sales and now was returning to school to get a degree so that he can help gifted youth advance in the sciences. Hall told to Plaintiff, he felt like he was not the best person as a salesman, though successful, and he wanted spend the rest of his life helping people. Slavin told Plaintiff that he had told Hall, not to worry, Plaintiff is a fair professor, don't worry. No harm to Hall had occurred prior to Cohen filing the formal complaint. No conversation took place between Plaintiff and anyone, student or administrator, providing any notice that Hall had a concern. Chain of command was not followed.

116.     In May 2010, Cohen filed a formal complaint, as policy allows the chancellor such discretion, against Plaintiff based on Hall's conversation with the administration. Hall did not file nor support the formal complaint. Plaintiff asked the complaint be postponed to the fall as he was spending 10 weeks that the summer on a National Science Foundation grant in Tennessee with 2 PUC students. Cohen refused to allow for the delay. Plaintiff was investigated by phone for 6 weeks A hearing was held in or about September 2010. The complaint was unsubstantiated.

117.     In the time frame of May 2011, Plaintiff was walking to get mail. Plaintiff met Maria Longas ("Longas") in the hallway. Longas asked Plaintiff about his daughter and what she was doing this summer. Plaintiff answered. Longas has always given Plaintiff's daughter gifts and played games with her. They were friends. Walking back from the mailroom to his office, Plaintiff passed Pinnick's office where Longas and Pinnick were talking. Plaintiff heard Longas say to Pinnick, I didn't get any information about Jodi.

### Research

118.    Dr. Joe Bularzik did not receive the NSF-DOE FaST grant he applied for at

Argonne National Labs. Plaintiff received in 2 consecutive summers the NSF-DOE

FaST grant at Oak Ridge National Labs.

119.    Attemps to undermine Plaintiff's research were performed on 4 occasions by

alleged by students who were coerced by faculty (alleged Mike Pelter and Libbie Pelter).

### CAUSE OF ACTIONS

### COUNT I. FREEDOM OF SPEECH 1ST AMENDMENT

1.  The first amendment is a means of protection.

"The first amendment to the U.S. Constitution guarantees Freedom of expression consists of the rights to freedom of speech, press, assembly and to petition the government for a redress of grievances, and the implied rights of association and belief."

2.  As Academic conduct, or misconduct, is an interest of public importance rather than just

the private interests of the persons involved. *Feldmon v. Ho*, 171 F.3d 494, 495-496 (7th

Cir. 1999). See also *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 413-16,

99 S.Ct. 693,695-97 (1979).

3.  Factual disputes relating to the factors to be considered in the Pickering balance preclude

summary judgment). See also *Myers v. Hasara,* 226 F.3d 821, 827-828 (7th Cir.2000)

> *Pickering* contemplates a highly fact-specific inquiry into a number of interrelated factors: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform [her] responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to inform decision making; and (7) whether the speaker should be regarded as a member of

the general public. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731(1968) See also *Williams v. Seniff*, 342 F.3d 774, 783 (7th Cir. 2003).

4. An allege violation of freedom of speech is common knowledge that tenure track faculty, a class of which Plaintiff is a member, are told to be silent until tenure is obtained. Even after tenure is obtained, it is common knowledge that promotion requires acquiescence with the administration on matters outside of the immediate classroom. Plaintiff spoke out by petitioning Purdue via the EEO complaint and grievance system to provide relief and protection for unlawful behaviors by Pinnick coming out of his hate for woman and Mike Pelter tampering with Plaintiff's equipment with the use of students lead to decisions denying plaintiff tenure. Purdue University Calumet also denied Plaintiff promotion and tenure because of using the EEO process, with subsequent agreement by the President of Purdue, Cordova and the Board of Trustees including Mamon Powers.

5. In response to Plaintiff's written conversations with Cohen, he wrote to plaintiff to go to the courts for relief as he did not want to provide that protection after the second formal complaint.

6. Plaintiff spoke to immediate supervisor Pinnick about challenges in department. Pinnick said that there are faculty in the department that hate you (Libbie and Mike Pelter). Mike Pelter have been engaged in tampering with federally funded equipment used by Plaintiff for research and the classroom. Libbie Pelter has knowingly protected her husband, Mike Pelter, and their research student Kraig Kmiotek in tampering with this federally funded equipment and work using this equipment.

7. Plaintiff used freedom of speech to ask University Police Chief, Anthony Martin, refused to question students alleged in tampering of Plaintiff's equipment and classroom technology systems funded by federal moneys due to his contract.

8. Plaintiff contacted Purdue University lawyer, Trent Klingerman, for relief and outlined suggestion. Cohen refused to provide relief or even discuss the matter.

9. Plaintiff wrote to Indiana Governor Mitch Daniels, Indiana Attorney General, the Merrillville Indiana FBI and the Munster, IN police (lieutenant) to question the students and investigate the tampering of federally funded equipment and no response was provided, thus no relief.

10. The admission of hate and the subsequent actions of hate, dismantling equipment, telling students in the Chemistry Study area or in the Pelter's research laboratory that Plaintiff is a bad teacher (an act of defamation) having not even been in Plaintiff's classroom, manipulating students to give Plaintiff poor teaching evaluations scores and denying promotion and tenure based on hate are alleged to be violations of the first amendment.

11. In Beauharnais v. Illinois, 343 U.S. 250, 254–58 (1952), if an utterance directed at an individual may be the object of criminal sanctions, no good reason appears to deny a State the power to punish the same utterances when they are directed at a defined group, "unless we can say that this is a willful and purposeless restriction unrelated to the peace and well–being of the State."

12. Some statements are so defamatory that they are considered defamation *per se;* and the plaintiff does not have to prove that the statements harmed his reputation. When a plaintiff is able to prove defamation *per se,* damages are presumed, but the presumption is rebuttable. The statements made to students by Mike Pelter that Plaintiff is bad teacher

that harm via coercion occurs before the student has taken Plaintiff's class. Plaintiff's upper level class is taken after Mike and Libbie Pelter's classess and often after their junior or senior year.

13. The academic expertise held by the Pelter's position is moot as they have not visited Plaintiff's class. In the department of Chemistry and Physics and PUC, it is common knowledge that it is considered "death" if one faculty member visits another faculty members class.

14. The tests of constitutionality or of constitutional protection are (1) statements are made with malice and may lead to "hate crimes" (2) must lead to a public concern, (3) public officials, the classroom, topics of public debate are held to a high standard of protection than other categories.

15. It is of public concern that potential employees of PUC students, parents and citizens whose taxes support public higher education know that the comments of students in a student evaluation survey of a faculty class can be used as the sole reason Purdue denies faculty employment. Yet, it is not the students who are responsible for faculty employment decisions and the students hold no training in suggesting the disengagement of a faculty member's employment at PUC. The students on average do not know how their student evaluation forms are used. There is no explanation of the responsibility implied by students in filling out this form.

16. The public needs to know that Higher Education has come to a place where faculty prejudice is used to manipulate students with the intent to do harm to other faculty. Although this practice is against Purdue Policy, yet faculty are permitted to use students to violate codes of conduct.

17. Plaintiff wrote to Governor Mitch Daniels and Attorney General Ron Zeller speaking out against actions taking place against plaintiff. The Governor is voted into office by Indiana residents to make decisions that protect the residents of Indiana. This display of speech went without response from former governor Mitch Daniels. Now Mitch Daniels is the President of Purdue. This series of events suggests reason that that former governor Mitch Daniels closed his eyes to Plaintiff's report of alleged wrong doing and request for relief.

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,* 447 U.S. 557.

## COUNT II. EQUAL PROTECTION 14TH AMENDMENT

18. The First Amendment, as incorporated into the Fourteenth,

   "protects the citizen against the State itself and all of its creatures -- Boards of Education not excepted. (Nor, we may add, Boards of Regents)...." It has been clear that the claim of educational competence does not automatically resolve questions that require a constitutional separation of academic authority from academic usurpation of power forbidden under our constitution to any authority, high or petty. *West Virginia Board of Education v. Barnette,* 319 US 671.

19. In McPhaul v. Board of Com'rs of Madison County, 226 F.3d 558 (7th Cir. 2000), the court explained: To state a prima facie case under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that she: (1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse employment action; (4) was treated differently from members of the unprotected class; and (5) the defendant acted with discriminatory intent. Greer v. Amesqua, 212 F.3d 358, 370 (7th Cir. 2000).[8]

20. During the time period August 2007 to May 2009, Plaintiff had Gender Identification of Female, a protected class. There were other's similarly situated individuals with a Gender Identification of Female in the same department as plaintiff of an unprotected

---

[8] http://www.garlands-digest.com/treatise/17/17610.html

class such as Neeti Parashar and Libbie Pelter who were tenure track during the same time as Plaintiff.

21. It is a fact that Neeti Parashar and Harold Pinnick had screaming matches that could be heard all the way down the hallway. It is a fact that Harold Pinnick told Plaintiff and Joe Bularzik to give Libbie Pelter a hard time regarding her teaching. It is a fact that Neeti Parashar was accused on multiple occasions for cheating on her student evaluation forms and once she obtained tenure Dean Suson explained that it was a poor decision to grant her tenure. It is a fact that Harold Pinnick told Plaintiff the first year of employment that Libbie Pelter did not deserve tenure. It is a fact that the Faculty Senate had a common belief that Harold Pinnick hated women. It is a fact that respected Professor Leslie Rittenmeyer told Plaintiff that Harold Pinnick hates women after Harold Pinnick and Leslie Rittenmeyer worked together on the faculty-senate. This shows discriminatory intent.

22. Plaintiff suffered adverse employment action by being denied tenure 3 times, but each time for a different reasons: lack of research, lack of service and poor teaching. It is irrational that one year Plaintiff is excellent in 2 categories and not in a third while in another year Plaintiff excels in a different two categories and fails in a different third category.

23. Male members who were tenure track during the alleged period received PT their first attempt. Joe Bularzik, Shawn Slavin and Adam Rengstorf. Rob Napora was told by Dean Suson that although he had to wait until his penultimate year, he would have no difficulty in getting P&T. Rob chose to leave PUC. Joe Bularzik was protected at the highest levels of the Purdue Calumet Adminstration. and Joseph Bularzik had become

personal friends with Vice Chancellor Ibrahim and Director of Undergraduate Research Z. George Hong. Moreover, Joe Bularzik was allowed to make about 3 edits on his P&T documents at the department level. This is against policy according to Cathrine Murphy head of the Math Department. Moreover, Bularzik claimed he had no "bad" student evalations. Plaintiff has direct evidence in the form of an affidavit to the contrary. Gretchan Wolf stated to Plaintiff that Joe Bularzik "lied" on his P&T documents taking credit for a class she developed.

24. Adam Rengstorf had the protection of Shawn Slavin, Megan Picket (former classmates) and Pinnick. Adam Rengstorf had the support of Chancellor Cohen as supported by his admission to the Cohen's reading circle. Adam Rengstorf also had the support of fellow department members Shawn Slavin and Megan Pickett for which all 3 had the same graduate thesis advisor. When Adam Rengstorf went up for P&T, the chair of the department was his friend and colleague from graduate school Shawn Slavin.

25. Shawn Slavin received P&T in an unusual fashion. He submitted his documents for annual review. After submission Maria Longas told him to go up for P&T and provided direct guidance in rewriting his entire document using her template. Then Shawn Slavin was allowed to resubmit his document. Maria Longas supported his P&T at the School level.

26. Plaintiff on one occasion filled out the incorrect annual review document and was not allow to revise and resubmit document, thus was given no review for that period.

## COUNT III. DUE PROCESS 42 U.S.C.S. § 1983[9]

27. Defendants affirmatively acted to create, or increases a plaintiff's vulnerability to, or danger from private violence. (1) The defendants created the following dangers and-or increased the plaintiff's vulnerability to the danger in some way.

    a. Plaintiff alleges Pinnick used language that was demeaning. Pinnick tried to remove Plaintiff from her job by giving lectures meant for full time faculty to a part time faculty member. Pinnick wrote false information on FORM 36 of the tenure and promotion document regarding Plaintiff's publication(s) not being in referred journals. The department tenure and promotion committee incorrectly wrote that Plaintiff coauthored 2 textbooks which are research books in the area of specialization are regarded by peers as the "Bible of Chromatography." There is documentation that Pinnick "hates women."

    b. Plaintiff alleges Mike Pelter, Libbie Pelter, Kraig Kmiotek and Daniel Pop were involved in dismantling and tampering with Plaintiff's research used in federally funded research and University own, federally funded classroom electronic equipment. Mike Pelter has said to Chemistry students that Plaintiff is a poor techer, while MikePelter has not been in Plaintiff's classroom while teaching. MikePelter is an angry man known to hate everyone.

---

[9] Under 42 U.S.C.S. § 1983, state-created danger is recognized as a basis for substantive due process claims. State actors are liable under § 1983 only for their own actions except where a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence. To state a prima facie case, the plaintiff must show that (1) state actors created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) the plaintiff was a member of a limited and specifically definable group, (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the conduct, when viewed in total, shocks the conscience.

c. Plaintiff was accused of speaking about his surgeries to student Keith Hall (Hall's). Keith Hall, student of the age of Plaintiff, exceptionally bright student had previously taken a class with Robert Kramer (Kramer). Instead of using the chain of command, to discuss Hall's concerns, Cohen in his capacity of Chancellor, and Roger's in his capacity of Vice Chancellor of Academic Affairs is with the influence of Kramer, Suson, the Pelters and Pinnck, issued a formal complaint against Plaintiff.

d. Two male professors were alleged in complaints to the EEO office for sexual harassment: Drs. Lash Mapa and Geoffrey Schultz. Dr. Schultz eventually was removed as chair. There was no visible change in behavior. This is an example of a failure in due process at PUC.

e. The student evaluation forms had no chain of custody, a failure a due process.

28. Plaintiff is a member of several protected classes and definable groups.

a. Plaintiff had a gender marker of female prior to May 2009.

b. Plaintiff had a gender marker of male after May 2009.

c. Plaintiff does not meet sex stereotypes.

d. Plaintiff is a single parent, raising a child.

e. Plaintiff is white and of East Indian Descent.

29. The actions of defendants' were an attempt to have Plaintiff issued a terminal contract and removed from employment at Purdue Calumet as soon as possible using the Tenure and Promotion policy system. Furthermore, Cohen used the policy that allows him, at his will, to issue a formal complaint against Plaintiff based on ethical violations.

30. The risk of being caught for unlawful behavior was known to the defendants as behaviors and decisions against Plaintiff had been submitted to the Purdue Calumet internal EEO

formal complaints and grievance process to restore Plaintiff to a condition as if no harm was done. The defendants knew that the court has judicial powers over PUC. Cohen wrote Plaintiff a letter asking Plaintiff to go to external systems of adjudication such as the courts and not continue with internal EEO processes to attempt to resolve behaviors and decisions by the defendants that were unlawful.

31. The defendants acted as a group by disregarding due process. The defendants have a history of disregarding processes. One example is Cohen instituted a no-smoking policy and put signs indicating so on campus. Cohen publically announced this policy would not be followed because of fear of student's reactions. Rogers in one of the formal grievances against Plaintiff required the process to include procedural and substantive issues to be addressed in the hearing. Rogers excluded substantial issues from being included in the scope.

32. The conduct of educated decision-makers who have strong policies of upholding the highest of behaviors in a system of Higher Education is an abomination. The lack of promotion and tenure policies at a top rank institution such as Purdue University gave an open forum to follow arbitrary procedures for candidates depending on how decision-makers and faculty feel, not based on performance. Faculty used students to by telling the students Plaintiff was a bad teacher. Faculty used students to collect information behind the scenes and used this information to deny Plaintiff promotion and tenure. The common understanding is to use the information in the promotion and tenure document only to make decisions. Personality is not a criteria in promotion and tenure. The use of students who come to higher education of learning should not be involved in department politics, nor should they be manipulated to be used to make decisions on the employment

Page **57** of **70**

of a faculty member. The use of students to damage equipment and set-up an instructor

for poor student evaluation scores is a shock to the conscience. The ultimate adverse

reaction was that Plaintiff did not receive tenure. The worst is that Plaintiff was at the top

of his field. Loss of tenure mean loss of a career at the top rank of Plaintiff's field. That

time and that lost opportunity cannot be gained.

(2) the plaintiff was a member of a limited and specifically definable group, (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the conduct, when viewed in total, shocks the conscience.

## COUNT IV. DISCRIMINATION Title VII Civil Rights Act 1964, 42 U.S.C. § 2000e *et seq.*, (SEX OR GENDER DISCRIMINATION- FEMALE)

33. In Durkin v. City of Chicago, 341 F.3d 606, 613 (7th Cir. 2003), the court explained:

Under McDonnell Douglas, a plaintiff establishes a prima facie case of sex discrimination if she demonstrates that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate employment expectations; (3) in spite of meeting the legitimate employment expectations of her employer, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees. *Markel v. Bd. of Regents of the Univ. of Wis. Sys.,* 276 F.3d 906, 911 (7th Cir. 2002).

34. Plaintiff is a member of the protected class of female from the first day

employment until 2009. As will be shown by Plaintiff's work product and

reviews, plaintiff met the expectations of the contract. Plaintiff published about 3

papers in refereed journals to meet the research requirements for tenure. Service

was not a requirement for promotion from Assistant to Associate professor, yet

Plaintiff volunteered to serve on the Master's program committee. Plaintiff

volunteered to serve on Howard Cohen's advisor committee, for which Jane B.

Doe was denied. Plaintiff served the community by giving a talk at a local High

School regarding careers in the sciences. Plaintiff served on various advisory

boards. With regards to teaching, the record states from Shawn Slavin that there is nothing wrong with your teaching. The record states from Maria Longas that anyone getting scores of 4.5 or above are not realistic. The record states there is no chain of custody for teacher evaluation forms. The record states that there was no specific uniform policy for student evaluations. The record states that Harold Pinnick did not perform regular in class teacher evaluations. Libbie Pelter refused to allow Harold Pinnick into the classroom for teacher evaluations. Alleged in this complaint is that students were manipulated to give Plaintiff poor evaluations. Despite this, plaintiff has a solid record of teaching both in the classroom, in the laboratory and in student research.

35. The adverse action served to Plaintiff was denial of tenure and regular intimidation, harassment and being ignored. The adverse action also constituted Plaintiff reporting to the EEO officer (via Howard Cohen) and Ralph Rogers complaints and grievances; respectively, to stop the unlawful behavior. This took away time away from Plaintiff's work activities and impacted Plaintiff's personal life in a negative manner.

36. Assistant professors that were required to leave PUC due to lack of support from the administration during the period of Plaintiff's employment in the Department of Chemistry and Physics were Jatila van der Veen, Alice Kolakowsi and Megan Picket. Male assistant professors were allowed to be promoted: Joe Bularzik, Adam Rengstorf, Shawn Slavin, Robert Kramer and Rob Napora (though he left Purdue prior to going up for P&T). It has been stated by the Faculty-Senate of PUC and by Dr. Leslie Rittenmeyer

that Harold Pinnick hates women. Daniel Susan stated that Harold Pinnick was removed from his chair position because of Plaintiff's complaint as Dean during a meeting of the results of my second P&T decision. The ultimate adverse reaction was that Plaintiff did not receive tenure. The worst is that Plaintiff was at the top of his field. Loss of tenure mean loss of a career at the top rank of Plaintiff's field. That time and that lost opportunity cannot be gained.

## COUNT V. DISCRIMINATION Title VII Civil Rights Act 1964, 42 U.S.C. § 2000e *et seq.*, (NOT FITTING GENDER STEREOTYPES)

37. Plaintiff is also a member of a protected class of not meeting sex stereotypes.

38. There have been two members of the department of Chemistry and Physics who have changed their gender identification. Dr. Pickett told Plaintiff of the challenges in the department and at the school level regarding what bathroom to use, individuals making dirty faces while walking by her office and by faculty mocking her. Dr.Longas told Plaintiff Dr. Picket would never have received tenure, but we could not find anything against Dr. X. Regarding the Plaintiff Maria Longas said they could find a reasons to deny tenure. It is highly unusual that a hiring chair does not support individuals hired for tenure. This is in contradiction to Harold Pinnick's words Plaintiff's first year in office that there is no reason anyone in a tenure track position cannot get tenure in this department. Each person has the qualities and abilities to achieve tenure.

39. See Discrimination by sex for meeting standards of employment requirements.

40. Daniel Suson told Plaintiff directly that the change in gender did not help in getting tenure.

41. Mary Beth Rincon in her role as Human Resource Manager told Plaintiff to not use the male restroom only in the Gyte Building because male faculty in the Chemistry and Physics Department complained they were uncomfortable. Plaintiff was told that Plaintiff was allowed to use the male restroom in all other buildings on campus. Also, Plaintiff was told Plaintiff's safety was as stake. It would behoove Plaintiff to use the handicap bathroom on the first floor instead of the male restroom. The ultimate adverse reaction was that Plaintiff did not receive tenure. The worst is that Plaintiff was at the top of his field. Loss of tenure mean loss of a career at the top rank of Plaintiff's field. That time and that lost opportunity cannot be gained.

## COUNT VI. RETALIATION Title VII Civil Rights Act 1964, 42 U.S.C. § 2000e *et seq.*,

42. Plaintiff filed 3 formal complaints. After the first formal complaint, the other 2 complaints, which were denied were retaliatory. Plaintiff files 2 grievances on denial of P&T. The process and denial of the grievances was an act of retaliation. Plaintiff went up for P&T 3 times. Each time a different reason was given, one research, one service and other teaching. It is not possible for one year to be excellent in research and be poor the following year. The argument follows for service and teaching. The ultimate adverse reaction was that Plaintiff did not receive tenure. The worst is that Plaintiff was at the top of his field. Loss of tenure mean loss of a career at the top rank of Plaintiff's field. That time and that lost opportunity cannot be gained.

## COUNT VII. OBSTRUCTION OF JUSTICE (18 USC 73)

43. Obstruction of justice is a very serious federal crime, a felony under U.S. law. Plaintiff approached Chief of Police Martin to investigate students and faculty regarding tampering with equipment. Police Chief Martin said he could not perform the investigation because of the nature of his contract with the university.

44. Kraig Kmiotek and Daniel Pop in conjunction with Micheal Pelter have been directly reported by student Jacob Perrine and observed to have tampered with Plaintiff's classroom equipment and research equipment. Subsequently Jacob Perrine was hushed. Jacob Perrine needed a letter of recommendation from Libbie Pelter in order to receive admission to Purdue University, West Lafayette. Jacob Perrine did receive admission at Purdue West Lafayette. Kraig Kmiotek performed undergraduate research with Libbie Pelter for several year and encouraged Kraig Kmiotek to influence other students against Plaintiff. Nathan Dodge and Harold Pinnick all knew and did nothing to stop or report damage to property purchased from Federal Funds. Nathan Dodge told Plaintiff that he was concerned about Kraig Kmiotek adjusting the settings on Plaintiff's equipment, specifically the gas cylinders. He did nothing to report his observations to higher authorities as he wanted to stay away from the harsh department politics.

45. In January or February 2013 Nathan Dodge made a hang-up phone call on Plaintiff's cell phone at around 3:00 am. This is not a coincidence because about month or two prior, Nathan Dodge called Plaintiff and asked Plaintiff where he lived. Plaintiff asked Nathan Dodge about what happened to his medical school applications and then later his plans which are to go to graduate school. Nathen Dodge insisted on knowing if Plaintiff lived in the area. Plaintiff said yes and told some details. Plaintiff told Nathan Dodge if he needed a letter of recommendation Plaintiff would be happy to write one. Nathan Dodge

Page **62** of **70**

said he did not call about a letter of recommendation and hasn't decided whether he will ask the plaintiff. Clearly someone wanted to know where Plaintiff was living and knew Nathan Dodge worked with Plaintiff. This person, likely faculty Michael Pelter or Harold Pinnick asked Nathan Dodge to call Plaintiff.

## COUNT VIII WHISLE BLOWER ACT (FALSE CLAIMS ACT)

46. Plaintiff wrote to public figures whose responsibilities are to oversee the functionality of our Public Educational Systems: Mitch Daniels Governor at the time Plaintiff was employed at PUC and Ron Zeller, attorney general were written to. No response was given. Plaintiff called the FBI in Merrillville, IN and they said they would not respond. Plaintiff contacted the Board of Trustees of Purdue University many times and no response was returned. Unlawful behavior was reported numerous times and it went without even a written response of acknowledgement.

## COUNT IX. MISUSE OF FUNDS– 42 USC § 12753

47. **The Law:** "The starting point for any analysis concerning the misuse of public funds begins with the principle that public funds must be expended for an authorized public purpose. An expenditure is made for a public purpose when its purpose is to benefit the public interest rather than private individuals or private purposes. The misuse of public funds occurs when the personal benefit conferred by a public expenditure is not merely incidental. The term "public funds" is not limited to money, but includes anything of value belonging to a public agency such as equipment, supplies, compensated staff time, and use of telephones, computers, and fax machines and other equipment and resources."[10]

---

[10] http://oag.ca.gov/ethics/accessible/misuse

48. When grant money is received by PUC, it goes through a process. During the period of Plaintiff's employment the grant receipt post award process was in disarray. Maya Podboj (maiden name and name at time of action) and Bruce Miller (left PUC under duress) said that there are major problems in managing post award because faculty are not following the rules. A post award manager was hired after Bruce Miller was forced to leave PUC to straighten out the system and put the misuse of funds to an end. Even after being at PUC for 3 years there were struggles in managing Post Award. This impacted plaintiff because George Nanna awarded Plaintiff a grant. In post award, Nnanna used funds allocated at salary for supplies and refused to pay Plaintiff salary for award. In fact, Plaintiff was asked by Nanna through Pinnick to take a lump sum of money and distribute to the student as Plaintiff seems proper. This is unlawful as student works for the university and not the Plaintiff.

49. The Department of Chemistry and Physics charges technology fees and laboratory fees to students for use of the laboratories in the courses offered. The funds from the fees do not return to the Chemistry and Physics department in any logical way. This will be investigated in discovery.

http://www.purdue.edu/purdue/about/presidents.html

Martin C. Jischke oversaw a five-year strategic plan that focused on discovery, learning, and engagement to make Purdue a preeminent institution. Jischke initiated a capital campaign that brought in more than $1.7 billion -unprecedented for a public institution in Indiana - and oversaw the University's undertaking of more than 50 capital projects, including the construction of 43 new buildings. He initiated a program to provide need-based Purdue scholarships to a student from each of Indiana's 92 counties, and he also started a program to provide eligible students from Indianapolis a chance to earn a four-year scholarship for a science-related career. The crown jewel of Jischke's tenure was the creation of the $300 million Discovery Park, Purdue's hub for interdisciplinary research that is home to 10 primary centers focusing on everything from biosciences, the environment, and manufacturing, to oncological sciences, cyberinfrastructure, and

Page **64** of **70**

healthcare engineering. Jischke became Purdue's 10th president in August 2000 after serving nine years as president of Iowa State University. He received his bachelor's degree in physics from the Illinois Institute of Technology and his doctorate in aeronautics and astronautics from the Massachusetts Institute of Technology. Jischke's experience in higher education also includes 17 years as professor and dean at the University of Oklahoma and five years at the University of Missouri-Rolla.

http://www.purdue.edu/president/stepdown.html downloaded 12JUL11
July 1, 2011 In the next year alone, we will dedicate or break ground on 14 new facilities for student success and research.

## COUNT X. UNLAWFUL EMPLOYMENT PRACTICES 42 USC § 2000e–2

50. In the department of Chemistry and Physics the following relationships exist. It is highly unlikely that these hires were made based on the best candidate and equal opportunity. While Michael Pelter is chair of the department his wife Libbie Pelter is hired as a tenure track Professor. Three faculty in Physics have the same Ph.D. advisor: Megan Pickett, Shawn Slavin and Adam Rengstorf.

51. In the period of question the other tenure track faculty that were hired left PUC either under duress or on their own initiative. Jatila van derveen, Robert Napora, Alice Kolakowska, Plaintiff. The only other "survivors" of the tenure track process are Neeti Parashar and Robert Kramer. Neeti Parashar obtained tenure in her 2nd year, the first year Dean Daniel Susan was employed. It is understood that Harold Pinnick did not support Neeti Parashar when she went up for tenure her first year and screaming matches could be heard down the hall. Dean Daniel Suson supported her promotion and tenure.

52. Dean Daniel Suson supported Robert Kramer's promotion directly to full professor with tenure. Reports of improper hiring practices were reported to Mary Beth Rincon during the hiring of Robert Kramer.

## COUNT XI ROBBERY AND BURGLARY (Breaking and Entering) 18 USC 103

**The Law:**  the criminal act of entering a residence or other enclosed property through the slightest amount of force (even pushing open a door), without authorization. If there is intent to commit a crime, this is burglary. If there is no such intent, the breaking and entering alone is probably at least illegal trespass, which is a misdemeanor crime. 2) the criminal charge for the above

53. Ten minutes prior to a formal complaint hearing with Chancellor Cohen and the 3 member panel, Plaintiff's home security system operator called Plaintiff.  The home security service reports in writing, the back slide glass door sensor went off as well as the motion sensor in middle of the lower floor.  This caused the alarm to trigger.

54. City of Munster police arrived on the scene.  Plaintiff had the choice of going home or going to the hearing.  Chancellor Cohen did not offer to reschedule the hearing.

55. By the time the city of Munster arrived the intruders had left.

56. This is the first and only time Plaintiff's alarm system has gone off by an intruder.

57. It is highly unlikely that the timing of the alarm and the hearing is a coincidence.

58. Once PUC was mentioned, the Munster Police chose not to investigate.

59. The PUC police refused to investigate possible suspects. This incident also comes under Count VII Obstruction of Justice.

## COUNT XIIa. VIOLATION OF CONFIDENTIALITY ( 5 USC I(5)(II) § 552a )

### 5 USC § 552a - Records maintained on individuals

60. **The Law:** (b) **Conditions of Disclosure.**— No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.[11]

---

[11] http://www.law.cornell.edu/uscode/text/5/552a#FN-1

61. Shawn Slavin when he became chair said he was surprised how many faculty members know me. Plaintiff asked, how did they know Plaintiff. Slavin answered, by all of your complaints.

62. Students such as Kraig Kmiotek and Daniel Pop were directly involved in tampering with Plaintiff's equipment as influenced by the Pelters.

63. Students Sortiroglue and Wasowitz and Dodge knew of the complaints and did nothing to report the harassment oblidged for them to report by the code of honor at Purdue Univerversity Calumet and the faculty handbook.

## COUNT XIIB. LIBEL (32 CFR 516.27)[12]

64. **The Law:** intentional infliction of emotional distress

65. Counts XII are merged into an A and B because they are based on the same information.

PUC has a policy of confidentiality of complaints and grievances. Violation of this

confidentiality led to emotional distress. There was no reason for certain individuals to

know about my formal complaints and grievances, yet they knew: Adam Rengstorf, Mrs.

Mojtahead, Chenn Zhou, Niaz Latif, Cathy Murphy, Mary Ramos, the replacement for

Mary Ramos, Jatila van der Veen, Robert Kramer, Neeti Parashar, Debra Grant, Norm

Reilch (maybe misspelled), the students (e.g. Mr. Anekwe, Kraig Kmiotek, Daniel Pop)

for example.

66. In Plaintiff's last 2 years of employment at PUC, regularly Adam Rengstorf would see

plaintiff in the hall and turn the other direction on his own and other times while walking

with Shawn Slavin. However, Shawn Slavin would correct him and continue in their

direction. In my last year at Purdue, Cathrine Murphy and Chenn Zhou would no longer

look at me nor say hi passing in the hallway. Mrs. Mojtahead pulled her daughter out of

my Chemistry Lab section. Mr. Anekwe, student, was told Plaintiff would not be

employed by PUC anymore. Mr. Kmiotek was influenced by Liberty Pelter and Michael

---

[12] http://www.law.cornell.edu/cfr/text/32/516.27

Pelter to tamper with Plaintiff's research equipment. All of this activity is because of

breaches in confidentiality and constitute libel.

67. When Shawn Slavin became chair of the Department of Chemistry and Physics he made

a statement that a lot of people know you. I asked him how? He answered, by all of your

complaints.

68. It is known from the research work documented in several reports on the Atmosphere of

Purdue Calumet that gossip was a major problem in the school.

## COUNT XIII. CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS 42 USC § 1985 -

69. (3) **Depriving persons of rights or privileges** If two or more persons in any State or
Territory conspire or go in disguise on the highway or on the premises of another, for the
purpose of depriving, either directly or indirectly, any person or class of persons of the
equal protection of the laws, or of equal privileges and immunities under the laws; or for
the purpose of preventing or hindering the constituted authorities of any State or Territory
from giving or securing to all persons within such State or Territory the equal protection
of the laws;

70. It is very clear that the first formal complaint was a warning bell. The second and third

formal complaints resulted in a conspiracy to cover-up the mistakes. This started from

the top with Howard Cohen not putting the discrimination and harassment to a stop. The

Board of Trustees did not put the discrimination and harassment to a stop. The

discrimination and harassment became like wild fire and ended up in breaking and

entering into plaintiff's home, tampering with Plaintiff's equipment and then the Plaintiff

became the black sheep where Plaintiff was now isolated from colleagues because of

their fear of the situation. The Governor, Mitch Daniels did nothing because he was

looking for employment at President of Purdue Calumet. The current President Cordova

could not do anything because the Board of Trustees had already made a decision to not renew her contract.

71. President Obama, President G.W. Bush, President Clinton, President H.W. Bush have all expressed a lack of engineering and science skills in the U.S. Yet, Plaintiff represents the top of his field and yet is not supported furthering the strategies of the U.S. government.

## COUNT IXX. DISCRIMINATION Title VII Civil Rights Act 1964, 42 U.S.C. § 2000e *et seq.,*
(Race and National Origin)

In the Department of Science and Technology there are 4 departments: Chemistry and Physics, Math and Computer Science, Biology and Engineering. If one looks at the numbers regarding who received tenure, one will find that all those hired with a National Origin of Chinese obtained tenure. This is because all of the Chinese were favored by political protection from Chenn Zhou. This, Plaintiff became a minority from the point of view of National Origin.

### RELIEF SOUGHT

WHEREFORE, plaintiff requests judgment against the defendant as follows:

A. That for the Counts, the Plaintiff asks that this Court Order the defendants to make Dr. Plaintiff whole by providing compensation for pecuniary and non-pecuniary losses, including loss of income, punitive damages, approval of medical coverage denied DEC 2010, forward pay in the form of income and medical coverage for life, loss of 4 years of back pay, emotional pain and distress, humiliation, suffering, inconvenience, loss of quality of life, mental anguish, and

any other such claims allowed by law, in the amount of five million dollars ($5,000,000.) and medical benefits for him and his child for life to return the Plaintiff at least financially and emotionally to a place as if the discrimination had not occurred;

B.    Plaintiff has lost everything.  This means Plaintiff lost his career as a scientist at the top of his field with all the opportunities he had to pursue his many ideas that would have been of great benefit to PUC.  Plaintiff has lost a constant, permanent source of income, which for a single parent is extremely stressful.  Plaintiff has lost job security.  Plaintiff will soon lose medical benefits if something doesn't change.

C.    And that Plaintiff is awarded pre-judgment and post-judgment interest and such other and further relief as the Court deem proper.

## JURY TRIAL DEMANDED

Dr. Doe requests a jury trial on issues raised in this complaint.

Respectfully submitted,

Dr. J. Doe.

By:  ___Dr. J. Doe_____
     /s/Pro Se Counsel

P.O. Box 1447
2450 Dundee Rd.
Northbrook, IL 60062
[illegible]@gmail.com
Doe son IN 2013